# Commonwealth *versus* West Chester Railroad Company.

1. When an act names a great number of persons, and then enacts that they, " or any three of them, be and are hereby appointed commissioners," it is in the alternative, and the whole number named, or any three of them, are appointed at the election of the individuals named in the act.

2. When it is the office of commissioners named to make proof under oath of certain facts specified in an act of incorporation, a surplus number of witnesses does not vitiate the proof or impair the effect of the evidence.

3. The fact that the subscribers to the capital stock of a corporation do not, at the time of subscription, pay five dollars on each share subscribed, is not ground to invalidate the charter.

4. No form of words is required in order to create a corporation. A grant of the power to perform corporate acts implies a grant of corporate powers.

QUO WARRANTO.

*Attorney-General Thomas E. Franklin* and *Everhart,* for relator.

The facts fully appear in the opinion of the court, delivered April 13th, 1855, by

LEWIS, J.—This is a motion to quash a writ of "quo warranto." The suggestion upon which it is founded sets forth two grounds of objection to the charter.

1st. It is objected that the forty-two commissioners who signed the certificate that the requisite number of shares had been taken to authorize the issuing of a charter, did not constitute a majority of a whole number named in the acts of April 11th, 1843, and 15th April, 1850. The validity of this objection depends upon the question whether eighty-seven commissioners were appointed by acts of assembly, as alleged in the suggestion. The language of the act of 1848 is peculiar. After enumerating a great number of names, it says that they, "or any three of them, be and they are hereby appointed commissioners." Did this appoint the whole number, or only three of them? Neither. It is in the alternative: and if construed like a deed to A *or to* B, would be void for uncertainty. But the act may be saved by the principle of election. Either the whole number named, or any three of them, were appointed at the election of the individuals named in the act. There is nothing to show that the whole eighty-seven elected to accept of the appointment. The suggestion shows that forty-two of them acted so far as to make proof of the necessary facts in a certificate to the governor. Three would have been sufficient for this purpose. Then it is

[Commonwealth v. West Chester Railroad Company.]

considered that the acts which they were required to perform were not of a judicial or even of deliberative character, but they were merely required to make proof under oath of certain facts specified in the act of incorporation. It cannot be supposed that a surplus number of witnesses vitiates the proof, or even impairs the effect of the evidence. We have considered this question as if both acts were one, and as if all the names were inserted in the first act. There is nothing substantial in this objection; and, if there was, it became immaterial by the action of the commonwealth subsequently.

The other objection is, that some of the subscribers to the stock, instead of paying the $5 per name, as required by law, at the time of subscribing, gave their respective promissory notes to pay the same at a future day. The omission to pay this sum at the proper time might be good ground for excluding the delinquent subscribers from the privileges of a stockholder, and at one time it was thought ground to defeat a recovery on his contract to pay. 16 S. & R. 147; 8 S. & R. 226. But even this view of its effect did not accord with the general professional opinion, and it was changed in regard to "turnpike companies" by the act of 1826. But the cases of the *Hibernia Turnpike Company* v. *Henderson*, 8 S. & R. 225; *Turnpike Company* v. *McCurdy*, 16 S. & R. 146; and *Clark* v. *Monongahela Co.*, 10 Watts, 366, show more clearly that this objection was not regarded as ground to invalidate the charter. This was emphatically stated as the law by Mr. Justice Duncan in the first-named case, and not denied by any of the judges. It was repeated as the opinion of all the judges in the second case and in the last. Mr. Justice Rodgers speaks of it as a mere irregularity, "which did not invalidate the charter." 10 W. 366. No decision has been made in this State in opposition to the opinion of the judges as indicated in the three cases cited. And why should an irregularity like this destroy the charter? It may have been participated in consistently with all that is set forth on this record by only two shareholders. In regard to those shares, the money may have been paid the next day. It is not alleged that the majority, or even any considerable number of stockholders, were guilty of a similar delinquency. Shall those who have paid their money in good faith be ruined by the irregularity of one or two others, over whom they have no control? Shall the State herself, who undertook to provide for the preliminary steps necessary to issuing the grant, take advantage of the errors of her own agents to the destruction of those who confided in their acts? It must be remembered that the commissioners were the agents of the State herself. The subscribers to the stock had nothing to do with their appointments, and are not responsible for their

errors.   But if there was anything originally in this objection, it has been repeatedly waived by subsequent legislation.   The original act was passed on the 11th April, 1848.   The charter was issued by the governor on the 18th Sept. 1850.   Since that grant issued, the legislature have passed the act of 29th January, 1853, authorizing the company to sell bonds to the amount of $600,000, and secure them by a mortgage, not only on their railroad and its appurtenances, but also on their "chartered rights and privileges;"—the act of 20th April, 1853, authorizing the company to erect a bridge over Maryland Creek, on the line of their road—the act of 8th of May, 1854, which clothes the company with extreme powers, similar to those conferred by the sixth section of the general railroad law of 19th February, 1849, and the act of 31st March, 1855, giving the company the right to create preferred stock, and borrow money on the faith of it.   These acts, of themselves, confer extensive corporate powers.   No form of words is required in order to create a corporation.   A grant of the power to perform corporate acts implies a grant of corporate powers, and the acts of assembly since the charter issued to this company contain full and ample recognition of its corporate powers, and authorize it to do what it could not perform without them. The authority to mortgage its corporate franchises is a power of that description.   This corporation has been in existence nearly five years.   The presumption is, that it has performed the duties for which it was created.   After obtaining large subscriptions to its stock from the borough of West Chester, and from individuals—after borrowing money on the credit of its road and its appurtenances, on its preferred stock, and even on the mortgage of its *corporate franchises*, in pursuance of direct authority from the legislature, conferred since the happening of the irregularity now complained of, and after expending the money in the construction of the contemplated work, it would be the grossest injustice to permit the State to avoid the charter for the mistakes of her own agents in matters of minor importance.   As against innocent stockholders and capitalists who advanced their money on the faith of the grants of the State, authenticated by the highest evidence known to the law, she is certainly bound by an estoppel founded upon the purest equity.   As against such parties, she must be deemed cognizant of the acts of her agents, and must be held to have waived all irregularities in bringing the corporation into existence.   9 Wend. 351.

It is ordered that the writ of *quo warranto* be quashed.