## Ervin, Appellant, *v.* Pittsburgh.

242

Argued May 9, 1940. Before SCHAFFER, C. J., MAXEY, DREW, LINN, STERN, BARNES and PATTERSON, JJ.

*Clyde A. Armstrong,* with him *Earl F. Reed, C. M. Thorp, Jr.,* of *Thorp, Bostwick Reed & Armstrong,* for appellant.

*John M. Marshall,* Assistant City Solicitor, with him *Wm. Alvah Stewart,* City Solicitor, for appellee.

*A. J. Bielski,* for intervenor.

OPINION BY MR. JUSTICE MAXEY, June 24, 1940:

The Commonwealth Trust Company of Pittsburgh, the assignee of the verdict rendered in this case by consent of counsel of the parties, in favor of the plaintiff and against the City of Pittsburgh, appealed from the order of the court below opening, vacating and setting aside the verdict.

On May 17, 1938, Mabel Ervin, the plaintiff, filed a suit in trespass against the City of Pittsburgh, alleging, inter alia, that on December 21, 1937, while crossing Shady Avenue at its intersection with Marchand Street in that city, she stepped into a hole or depression, was thrown to the ground, and sustained serious injuries, including a severe injury to her back and spine. The City Solicitor accepted service of the writ and statement on May 19, 1938, in accordance with the practice in his office. The chief investigator of the City's law department made a report showing the existence of two holes at the time and place pleaded.

On June 3, 1938, a consent verdict was entered in favor of plaintiff, against the city, in the sum of $10,500, the consent verdict slip being signed by Churchill B. Mehard, the City Solicitor for the City, and Max J. Spann, plaintiff's duly authorized attorney. In accordance with the customary procedure, a jury was sworn to take the verdict in the presence of a judge of the court.

On June 4, 1938, the plaintiff executed an assignment of the verdict to the Commonwealth Trust Company. The assignment was then noted upon the docket by the prothonotary, the costs charged to the defendant city, and a certificate of the prothonotary issued with respect thereto. On the same day but prior to the acceptance of the assignment by appellant, the City Solicitor, on a printed form furnished by the appellee city, certified with respect to the verdict in plaintiff's favor, as follows: "This verdict is final and no appeal will be taken." This certificate was also signed by the City Con-

troller, certifying that the assignment had been registered and indexed in his office.

On February 1, 1939, the city filed a petition and secured a rule upon plaintiff and the Commonwealth Trust Company to show cause why the verdict should not be vacated and set aside on the ground that the "petitioner is not aware of any statute or adjudication authorizing the City Solicitor to consent to verdicts against the City of Pittsburgh without trial, but that, on the contrary, the cases in which this issue has been decided negative such authority" and that "the City Solicitor was without authority, in law and in fact, to consent to the verdict" and it "is null and void." On January 26, 1939, one William F. Beatty filed a taxpayer's petition for leave to intervene and to set aside the verdict, contending that appellee's City Solicitor had no authority to consent to a verdict against the city. The court granted a rule to show cause thereon and subsequently allowed Beatty to intervene. Appellant trust company filed an answer to each of these petitions, and appellee city filed an answer to Beatty's petition. The City filed a supplemental petition, which it later amended and in which it alleged, inter alia, that "the injury and the City of Pittsburgh's liability therefore, the basis of said verdict, were unfounded and fraudulent in that . . . the plaintiff suffered no injury on December 21, 1937, as alleged in her statement of claim" and that "the verdict was obtained and entered into by the unlawful fraudulent and criminal collusion of plaintiff, her counsel and the then Solicitor of the City of Pittsburgh." Appellant in its answer to the supplemental petition and the petition to amend of the city, averred, inter alia, that "it purchased in good faith the assignment of the verdict from the plaintiff for the full amount thereof [$10,500.00], in reliance upon the certificate of the City Solicitor, duly authorized thereto, certifying that the verdict was final and that no appeal would be taken, as well as the certificate of the Controller of the City of Pittsburgh,

likewise duly authorized thereto, certifying that the verdict was duly registered in his office and indexed for payment by the city," and that "it purchased for value the assignment in good faith, in reliance upon and in accordance with the long established, unquestioned practice and custom of the City of Pittsburgh through its duly authorized officers and representatives, as aforesaid, throughout a period of twenty-five years and upwards." Depositions of witnesses were taken on the petitions of the city.

Counsel filed a stipulation as to certain facts, which were not in dispute and which, inter alia, are as follows: That the Charter Act of March 7, 1901, P. L. 20; 53 PS sec. 8381 et seq.; sections 8851-8853, as amended and supplemented, established the various executive departments of the City of Pittsburgh, including a Department of Law "under the charge, management, control and administration of one person" to be the head thereof, with the official title of City Solicitor. The ordinance provides further that the solicitor be the legal advisor of all the departments of the city and attend to all the city's legal business. For a period upwards of 24 years prior to the entry of the consent verdict in this case, and also during June, 1938, appellee's solicitors compromised and settled trespass suits pending in the courts of Allegheny County, and upon the compromise and settlement thereof, consented to verdicts for the amounts of the agreed settlements, and during the years 1934, 1935 and 1936, the present city solicitor, acting then as an assistant city solicitor, compromised and settled a substantial number of suits against appellee and filed consent verdicts therein "in accordance with the practice theretofore established and followed for many years, as aforesaid." Except in minor instances, the approval of such settlements and the entry of the consent verdicts "was never, during the period aforesaid, submitted to Council for formal action by resolution or ordinance." It has been the uniform practice during the

long period stated for appellee's solicitors to certify to appellee's controller, after a consent verdict has been entered, that it is final and that no appeal will be taken therefrom. The controller then causes such verdicts so certified to be registered and indexed in his office for payment. If funds are available, the verdict so certified and indexed is paid, and if not available, payment thereof awaits subsequent appropriation by Council. At or prior to the beginning of each fiscal year, council of appellee passes, and, during all of the period aforesaid, has passed its budget ordinance containing "appropriations for all the city departments and functions, including the payment of claims, verdicts and judgments" against appellee. Such appropriation had been and could only be an estimate of the amount necessary to pay claims and verdicts which had accrued and might accrue during the ensuing fiscal period. Heretofore no question was ever raised by appellee's Council as to the authority of its solicitor "to compromise and settle damage suits or to consent to the entry of verdicts therein, and such verdicts, to the extent of many hundreds thereof, involving many hundreds of thousands of dollars, have been paid in the period aforesaid out of moneys appropriated for the purpose, in the manner hereinabove described." It is further stipulated that "such assignments up to and including June 4, 1938, have always been unquestioned and have been considered excellent investments, and, over the period aforesaid, many banks, trust companies and other banking institutions, as well as other corporations organized for charitable purposes, or otherwise, and individuals, have taken assignments of such verdicts and held same for payment when funds would be made available by Council." There are presently "outstanding and unpaid, including the verdict herein, consent verdicts for the face amount of approximately $375,000, all of which verdicts were entered by consent of the then duly appointed and acting City Solicitor, or by the consent of the assistants of said City Solic-

itor, with his full knowledge and approval." These assigned verdicts are owned and held "by various individuals, firms and corporations, charitable, banking and otherwise, and, so far as is presently known, such assignments, equally with the assignment of the verdict herein, have been accepted in good faith and for value, with knowledge of the long course of practice in such matters, as is detailed hereinabove." Among the charitable institutions holding assigned consent verdicts against appellee are the Policemen's Relief & Pension Fund, which currently is the assignee of such verdicts totalling at least $48,938, and The Firemen's Relief & Pension Fund, which currently is the assignee of such verdicts totalling at least $32,275. Appellant, having had knowledge of the long course of practice and procedure in the settlement of damage suits against appellee city, as foresaid, and having had knowledge of the long course of practice and procedure in certifying verdicts as final and in indexing the same for payment prior to purchase by assignment, and in reliance upon that established practice and procedure and the certificates of the appellee city's solicitor and controller, purchased in good faith the verdict in this case for the amount of its face value. On March 8, 1938, Churchill Mehard, then appellee's solicitor, submitted to Council's Committee on Finance a similar specification of negligence cases against appellee, settled in the same manner by the taking of consent verdicts for the months of January and February, 1938. On March 15, 1938, a similar report was filed by Mehard with the same committee covering the week of March 7, 1938. It was also stipulated that former city solicitors followed this practice. Also, that Council of appellee city "during the months of July and August, 1938, conducted an extensive investigation of the facts and circumstances surrounding all verdicts entered against the City of Pittsburgh, defendant, by the consent of the City Solicitor, including the verdict entered in this proceeding, and the said Council of the

City of Pittsburgh, defendant, has made no recommendation or authorization of any kind with respect to such verdicts, or with respect to the verdict involved in this proceeding."

Appellee city, in support of the allegation in its petition that the verdict was obtained fraudulently and by criminal collusion, called several witnesses and also offered in evidence the indictments found by the grand jury against plaintiff and the indictments and convictions of Mehard, appellee's previous solicitor. The appellant trust company objected to all this on the ground that "such evidence is incompetent, irrevelant and immaterial" in that it purchased the verdict for value in good faith, in reliance upon the certificates issued by the Solicitor and Controller.

After argument on the facts and the law before the court below in banc, the lower court (Judge RICHARD-SON dissenting) entered the order opening, vacating and setting aside the verdict. This appeal followed.

This court agrees with the position taken by Judge RICHARDSON of the court below, in his dissenting opinion. He said, inter alia: "The Council of the City of Pittsburgh, by its course of conduct for over a period of at least twenty-five years, clothed the city solicitor with apparent authority to settle and compromise claims against the municipality, and, after they were liquidated and reduced to judgment, to issue certificates of the genuineness and validity of verdicts based upon these claims to assignees who wished to purchase them for investment. In my opinion, the City Council should not be permitted to deny responsibility for a practice of which it could not avoid knowing, and which it periodically sanctioned. In particular, it is difficult to excuse any lack of knowledge on the part of Council or deny its approval of the practice, when the annual municipal budgets contained items such as those specified in the stipulation (No. 6) entered into between the parties, namely that the number of cases settled and

consent verdicts entered and the total amounts thereof, were as follows:

| Year | Consent Verdicts | Approximate Total Amount |
|------|------------------|--------------------------|
| 1935 | 278 | $450,000 |
| 1936 | 148 | 217,000 |
| 1937 | 97 | 132,000 |
| 1938 | 190 | 360,000 |
|      | 713 | $1,159,000 |

. . . The Act of March 18, 1875, P. L. 7, sec. 10, 53 PS sec. 9507, provides that in lieu of any existing authority, the councils of any city of the second class shall have exclusive supervision of the official conduct of all city officers. This duty of supervision under the Act of 1875 is apparently in force, by reason of the provisions of the Charter Act of March 7, 1901, P. L. 20, Article XIV, sec. 14, as amended by the Act of May 31, 1911, P. L. 461, 53 PS sec. 9504. . . . There is no doubt that Council had actual knowledge of the practice of the settlement of cases against the City by its solicitors. Stipulations 1a to 8a inclusive, belatedly filed, indicate that both Mehard and his predecessor submitted detailed reports of cases settled by them by the taking of consent verdicts. . . . In my opinion, there was no statute or ordinance which limited the authority of the city solicitor in making the settlements, and certainly a municipality acts within its corporate powers in settling and compromising cases. It seems to me, therefore, that unless the act of the city solicitor is one which required legislative or executive action, the City of Pittsburgh is now estopped to deny the power which the city solicitor exercised. His acts were ministerial in their character and were ratified by councils of the City of Pittsburgh, in addition to its act of clothing him with the appearance of authority. One who knows that the officer or agent of a corporation habitually transacts

certain kinds of business for such corporation, under circumstances which necessarily show knowledge on the part of those charged with the conduct of the corporate business, assumes, as he has a right to assume, that such agent is acting within the scope of his authority: *Osborne v. Victor Dairies,* 138 Pa. Superior Ct. 117, 10 A. 2d 129."

The doctrine of estoppel is founded on considerations of sound public policy. There are circumstances in which the law will not permit a man to gainsay to the prejudice of another some act or statement of his, in reliance on which that other has acted. In *Waters's Appeal,* 35 Pa. 523, this court quoted with approval the following statement by Lord DENMAN in *Pickard v. Sears,* 6 Ad. & Ellis, 469, 474: "The rule of law is clear that where one by his words or conduct wilfully causes another to believe in the existence of a certain state of things, and induces him to act on that belief, so as to alter his own previous position, the former is concluded from averring against the latter a different state of things as existing at the same time." This court said further in Waters's Appeal: "In *Freeman v. Cooke,* 2 Exchequer R. 661, Baron PARKE approves of the principle as thus defined, cites numerous cases in support of it, and tells us that by the term 'wilfully,' as used by Lord DENMAN, we are to understand, if not, that the party represents as true what he knows to be untrue, at least that he means his representation to be acted upon, and that it is acted upon accordingly."

This court in *Breinig et ux. v. Allegheny Co. et al.,* 332 Pa. 474, 485, 2 A. 2d 842, reiterated the principle that "a municipality like a private corporation is subject to the doctrine of estoppel [citing cases]. It may be estopped to deny the authority of its agents and employees to act if it has the power to, and by its conduct does, clothe an agent with the appearance of authority [citing cases], though it cannot be bound for an act of its agent in excess of its corporate powers, or in viola-

tion of positive law, or for an act requiring legislative or executive action." What was done in the instant case does not fall within the three things for which a municipality "cannot be bound for an act of its agent." We cannot hold in this issue that under the facts of this case and in view of the long acquiescence of the city in the practice of the City Solicitor in "consenting" to verdicts against the city, the act of the City Solicitor in this case "required legislation" to make it valid.

Since municipalities are not immune against estoppels, the only question here is whether or not this record supports the estoppel invoked. The official record of the verdict in this case, which verdict was duly assigned to the Commonwealth Trust Company, is as follows: "June 3, 1938. On trial list and jury sworn. Eo die verdict in favor of plaintiff in the sum of Ten Thousand Five Hundred ($10,500) Dollars." There is nothing in the record to indicate that the verdict was by consent. The record indicates a verdict as in any other case. On July 24, 1938, the city paid the record costs charged to it on the date of the assignment of the verdict to the trust company. The authority of the city solicitor to certify to the finality of a verdict against the city and that no appeal will be taken with respect thereto and the authority of the city controller to index a verdict for payment and to so certify for the benefit of an assignee, have not been questioned. A clerk in the controller's office testified that in respect to the issuance of similar certificates "there has been no change in the office" since the transaction in question. He was asked the following question: "And you are still following the same procedure that has always been followed in the last twenty-five years, is that right?" He answered: "Yes." He also testified that the verdict in favor of Mabel Ervin had been duly reported to the controller's office before the assignment to the Commonwealth Trust Company. It would be difficult to find a situation more justly calling for the application of the principle of

estoppel than the situation we have here. We cannot agree with the court below that "the essential elements of equitable estoppel are not present in this case." The court said: "None of the elements is present because there was no representation as to any *fact*, but merely a mistake as to the law, in regard to the authority of the City Solicitor to settle cases." The court takes too narrow a view of the word "fact," which it italicizes. The "fact" here represented for a score of years and on which the Trust Company relied was that the City Council held out its Solicitor as having authority to settle suits against the city, and again and again appropriated funds for the payment of these consent verdicts. Any individual so holding out for twenty-four years his attorney as possessed of the power to settle claims against him would clearly be estopped to deny that agency to one who had acted to his detriment on the "fact" of agency thus represented.

In *Com. ex rel. Margiotti v. Union Traction Co.*, 327 Pa. 497, 194 A. 661, this court declared that estoppel by laches may be asserted even against the Commonwealth. In our opinion in that case we said: "After the validity, or apparent validity, of corporate transactions so conducted in public view has gone unchallenged and has not only been recognized but participated in over the specified period by the General Assembly, by the courts of the Commonwealth and by the Public Service Commission, since its creation, in dealing with these transactions, we think that established principles of law and equity as hitherto administered require that we hold that persons who have invested in the stocks, bonds or other securities issued on the faith of such conduct by the public authorities, did not assume the risk of a detrimental change in the Commonwealth's attitude that would impair the resulting investments. As was said in quashing the writ in *Com. ex rel. Attorney General v. West Chester Railroad Co.*, 3 Grant 200, after persons have acted 'on the faith of the grants of the State,

authenticated by the highest evidence known to the law, she is certainly bound by an estoppel founded upon the purest equity. As against such parties, she must be deemed cognizant of the acts of her agents.' "

In *Philadelphia v. Anderson et al.,* 142 Pa. 357, 21 A. 976, this court held that though the receiver of taxes is an elective officer, over whose selection and term of office the city has no control, he acts as her representative in performing the duty of certifying thus imposed upon him by law, and the city is bound by his certificate given to a person who in good faith has acted in reliance thereon, and that the receiver of taxes having given to a purchaser of land a certificate that on examination of the register of unpaid taxes for the years 1873 to 1877, inclusive, he found "nothing against said premises" except the taxes of 1877, the city was estopped from asserting a lien for the taxes of 1875, after the purchaser, in reliance upon the certificate, had paid the purchase money to his vendor.

The case of *Susquehanna County Auditors' Report,* 118 Pa. Superior Ct. 47, cited by the court below and by appellee, has no bearing on the instant case. In that case the court used the phrase: "Custom cannot override the statute." Its application was that the fact that it had theretofore been customary for the county commissioners to be reimbursed for their expenses in traveling to and from the county seat, did not confer upon them any legal warrant for such expenses. No question of estoppel was involved.

Appellee stresses the argument that since the Charter Act did not confer upon the City Solicitor the power to consent to verdicts against the city, he could not acquire that power by "practice or usage." In order to hold against the city in this connection, it is not necessary to controvert the above proposition. No one contends that the City Solicitor acquired by usage a power he did not lawfully possess. The contention is that when the city through its officials stood by for years and

permitted the City Solicitor to exercise the power now challenged, third persons were warranted in assuming that they could safely deal with the city on the assumption that the solicitor possessed the power the city apparently clothed him with. Such third persons acting in good faith are entitled to invoke against the city the doctrine of estoppel when the city now denies that which was implicit in its conduct.

The court below quotes the following from the *City of Indianapolis v. Ostrom,* 176 N. E. 246: "It is well settled that a city cannot be estopped by the acts of an officer where the act is beyond his authority." Here again there is confusion in applying an accepted principle. The estoppel invoked is not based on the City Solicitor's acts but on the city's long acquiescence in them. When a principal attempts to repudiate the acts of his agent and the party who dealt with the latter on the belief that he had the authority later denied him, invokes estoppel, it is based on the principal's representation of the agent's authority. In the instant case the misleading of the Trust Company to its detriment was primarily the misleading by the City. It is a fair assumption that if the City Solicitor had not consented to the verdict because of a corrupt motive, his action in doing so would never have been challenged by the City of Pittsburgh. The city is now attempting to repudiate the transaction not because the City Solicitor exceeded his authority but because he acted dishonestly. The City is in the same legal position any other principal would be in if after holding an agent out for 20 or more years as possessing the authority to do certain acts binding on the principal, he, the principal, sought to repudiate one of those acts because he discovered that the agent had personally profited from that act.

The case of *Pittsburgh Paving Co. v. Pittsburgh,* 332 Pa. 563, 3 A. 2d 905, cited by appellee, is inapplicable here. We there held that it is well settled that contracts increasing debt beyond the constitutional allowance are

illegal and void and that the city was not estopped, in an action by the contractor, to deny the validity of the contracts. We held that since the municipal indebtedness was ascertainable, it was the contractor's duty to ascertain it or act at its peril. In that case the contract was illegal and void and the city had done nothing to deprive itself of the right to plead that fact in defense of the claim. There was no act or statement on the part of the city on which the contractor had acted to his detriment and which the policy of the law required the court to say to the city: "You will not be permitted to deny that."

Judge RICHARDSON in his dissenting opinion aptly said: "There is nothing sacred in the word 'consent' and any verdict, like any other contract, may be attacked and set aside if fraudulent; but there is a great difference in the position of an assignee who has relied upon a certificate of the person charged with the payment of a debt that he has no defense to it, and an assignee who has failed to require such a certificate before purchasing the claim. If the Trust Company had not secured the certificate of the solicitor that the verdict was final, it would have been subject to every defense which the City could interpose against Mabel Ervin. . . . I can see no difference between a certificate that no appeal will be taken from a verdict consented to, and a verdict arrived at after a hotly contested case, so far as concerns an innocent purchaser thereof who has no knowledge of any defects in the consummation of the agreement which gave rise to the verdict."

When there are circumstances seemingly giving rise to an estoppel by one who has acted to his detriment by acting on another's assurance by word or conduct, the question usually resolves itself into this: Does right and justice require it?* Whether an estoppel will be

---

* See Dillon on Municipal Corporations, 5th ed., Vol. 3, p. 1900, sec. 1194.

applied depends on the facts and circumstances of the particular case. To vacate the verdict in this case to the great loss of the Trust Company, which took an assignment of it on good faith and paid full value for it, would be an act of injustice. It was the city which long acquiesced in the practice of permitting its Solicitor to consent to verdicts against it when settlements had been agreed to by the opposing parties. It was the city which failed to supervise the actions of its public servant.

We also think the instant case is one for the application of the rule that "where one of two innocent persons must suffer loss for the fraud of a third, the loss should fall on the one whose act facilitated it." In *Fifth St. B. & L. Assn. v. Kornfeld et al.*, 315 Pa. 406, 414, 172 A. 703, we said, quoting from an English case: "Neglect [sufficient to warrant the application of the rule] must be in the transaction itself, and be the proximate cause of leading the party into that mistake, and also must be the neglect of some duty that is owing to the person led into that belief, or what comes to the same thing, to the general public, of whom that person is one." Here the city's default or neglect occurred in the very transaction in question; it was the neglect of a duty owing to the Trust Company and the general public and was the proximate cause of leading the other party into something to its possible detriment.

The order of the court below is reversed and the verdict is reinstated.