636 A.2d 156

**THATCHER'S DRUG STORE OF WEST
GOSHEN, INC., Appellee,**

v.

**CONSOLIDATED SUPERMARKETS, INC., Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 25, 1991.

Decided Jan. 13, 1994.

470

Stephen J. Springer, D. Jackson Loughhead, Philadelphia, for appellant.

Joseph R. Podraza, Jr., Rachel R. Munafo, Philadelphia, for amicus curiae—The Phila. Bar Assoc.

C. Richard Morton, Nannette M. Swadey, West Chester, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and CAPPY, JJ.

## *OPINION*

NIX,[1] Chief Justice.

Appellant, Consolidated Supermarkets, Inc. ("Consolidated"), appeals from the Order of the Superior Court affirming the Order of the Court of Common Pleas which enjoined Consolidated from operating a pharmacy in the West Goshen Shopping Center ("the Shopping Center"). In this case, we granted allocatur to address the question of whether this Commonwealth should adopt Section 524 of the Restatement of Property as an exception to the Statute of Frauds and, if so, whether the facts of this case fit within the exception. However, because we find that this Commonwealth's Statute of Frauds does not apply to the instant facts, we need not address whether Section 524 should be adopted. For the reasons that follow, we reverse.

This case was commenced on April 29, 1987, by Appellee, Thatcher's Drug Store of West Goshen, Inc. ("Thatcher's"), which for the last nineteen years has been operating a pharmacy in the Shopping Center immediately adjacent to Consolidated's Shop–Rite supermarket. Thatcher's commencement of this action was in response to Consolidated's plan to operate a pharmacy in the supermarket.

The facts as found by the trial court are as follows: On October 29, 1965, Consolidated entered into a long-term lease with then owner, Enal Productions ("Landlord"), to open a Shop–Rite supermarket as an "anchor" store for the Shopping Center. Under the terms of the lease, Consolidated was prohibited from using more than twenty percent of its selling space for the sale of "non-food" items.

1. This case was reassigned to this writer on October 13, 1993.

In September 1973, Thatcher's entered into a ten-year lease with Landlord to open a pharmacy in the store immediately adjacent to the Shop–Rite supermarket. The lease contained the following paragraph protecting Thatcher's from competition within the Shopping Center:

Landlord shall not lease any store within the premises for use as a drug store or pharmacy or for the sale of medical equipment or prosthetic supplies. The foregoing restriction shall not apply to any of the shopping center presently used as a supermarket or department store.

Record at 376a. The lease also prohibited Thatcher's from selling any "food."

In 1976, Thatcher's installed a refrigeration case from which it sold milk. In response, Consolidated posted a sign in front of the supermarket announcing that: "Coming soon—a Shop–Rite pharmacy." Upon seeing the sign, Ronald Zukin, the president and sole shareholder of Thatcher's contacted Joseph Greenblatt, the comptroller and vice-president of Consolidated. Mr. Zukin asked Mr. Greenblatt why the sign announcing the coming of a Shop–Rite pharmacy was in the window. Mr. Greenblatt responded, "We don't want you in the dairy business," referring to Thatcher's recent selling of milk. After some discussion, Mr. Greenblatt said, "You get out of the dairy business and we won't open a pharmacy." Within a week, Thatcher's removed the refrigeration case, and, in response, the supermarket removed the pharmacy announcement.

In 1983, nearing the end of Thatcher's ten-year lease, Mr. Zukin approached Landlord about securing a ten-year renewal. Mr. Zukin was informed that Consolidated desired Thatcher's space to use as a Shop–Rite pharmacy. As a result, Mr. Zukin located an alternative site for the pharmacy three blocks from the Shopping Center. Mr. Zukin, with his attorney, negotiated a lease at the new location, drew a deposit check, and was prepared to finalize the deal. Before finalizing that deal, Mr. Zukin had a conversation with Landlord and was advised that Consolidated had changed its mind

about taking Thatcher's space and that a renewal would be offered to Thatcher's.

When Mr. Zukin received the proposed renewal, he met with Mr. Greenblatt to seek assurances that Consolidated would not open a competing pharmacy. Mr. Zukin testified that Mr. Greenblatt's direct response was, "We don't hurt the little guys. We have no desire to want to hurt you and we have no intention of opening a pharmacy." Mr. Greenblatt admitted in testimony that this meeting took place but denied making such a statement. Based on the assurances he received from Mr. Greenblatt, Mr. Zukin executed a ten-year renewal in late 1983.

Within the next year, Mr. Greenblatt became aware that Thatcher's had a "Beverage Center" in front of its store. In response, a sign was again posted in the supermarket window announcing "Shop–Rite Pharmacy coming soon." Again, Mr. Zukin contacted Mr. Greenblatt, who advised him that Consolidated did not want Thatcher's to go into the soda business and, if Mr. Zukin would take his beverage center sign down, "we won't be in the pharmacy business." Within a few days, Mr. Zukin removed the beverage center sign and, immediately thereafter, the Shop–Rite pharmacy announcement was removed.

In 1985, Consolidated secured the rental space immediately adjacent to the supermarket, on the side opposite of Thatcher's. Thereafter, Consolidated removed the partition wall between the supermarket and the new space and secured the federal and state licenses necessary to operate a pharmacy. Aware of Consolidated's imminent plans to open a pharmacy, Thatcher's filed the instant action seeking to enjoin Consolidated from implementing its plans.

Thatcher's presented three grounds in its complaint in support of its request for injunctive relief: (1) breach of the lease between Consolidated and Landlord; (2) breach of an oral contract between Consolidated and Thatcher; and (3) estoppel based upon an oral promise and detrimental reliance. The trial court conducted an evidentiary hearing on May 7 and

8, 1987. At the hearing, the breach of lease argument was rejected by the trial court and the oral contract theory was abandoned by Thatcher's. The trial court ruled in favor of Thatcher's on the grounds of equitable estoppel and entered a *decree nisi* enjoining Consolidated from operating a retail, prescription pharmacy on the premises of the West Goshen Shopping Center.

Consolidated filed exceptions to the trial court's order claiming, *inter alia,* that the Statute of Frauds[2] rendered any agreement between the parties unenforceable. In its "opinion sur exceptions," the trial court upheld its decision on the basis of equitable estoppel but also determined that the Restatement of Property § 524[3] provided an applicable exception to the Statute of Frauds defense. The trial court denied Consolidated's exceptions and entered a final order. On appeal, the Superior Court, like the trial court, determined that the Restatement of Property § 524 provided an applicable exception to the Statute of Frauds defense.

Consolidated appealed and we granted allocatur. For the reasons that follow, we find that the Superior Court incorrectly affirmed the trial court's decision to enjoin Consolidated from operating a pharmacy.

■ The first question we must address is whether this Commonwealth's Statute of Frauds is applicable in the instant factual setting. By its terms, the Statute of Frauds governs "any ... interest of, in, or out of any ... lands...." 33 P.S.

---

2. The Statute of Frauds provides in pertinent part that: "all leases, estates ... or any uncertain interest of, in, or out of any ... lands, tenements or hereditaments, made or created by ... parol, and not put in writing, and signed by the parties so making or creating the same ... shall have the force and effect of leases or estates at will only, and shall not, either in law or equity, be deemed or taken to have any other or greater force or effect...." Act of March 21, 1772, 1 Sm.L. 389, § 1, 33 P.S. § 1.

3. Promises Enforceable by Estoppel.
    An oral promise or representation that certain land will be used in a particular way, though otherwise unenforceable, is enforceable to the extent necessary to protect expenditures made in reasonable reliance upon it.
Restatement of Property § 524.

§ 1. Consolidated argues that the oral promise created an "easement." However, this case does not involve an interest in land in the form of a negative easement. In this matter we are presented with an oral assurance by Consolidated that it did not intend to operate a pharmacy. Such an agreement not to compete does not qualify as an interest in land.

This Court indicated in *Clements v. Sannuti*, 356 Pa. 63, 51 A.2d 697 (1947), how a negative easement arises and operates.

> [T]here can be no easement, no incorporeal right, binding the servient tenement, the effect of which would be to deprive its owner of the right of use or possession thereof. "An easement is a liberty, privilege or advantage which one may have in the lands of another without profit ... It may be merely negative ... and may be created by a covenant or agreement not to use land in a certain way...."

*Id.* at 65, 51 A.2d at 698 (quoting *Slegel v. Lauer*, 148 Pa. 236, 240, 23 A. 996, 997 (1892)). This definition is not so broad that Consolidated's promise not to operate a pharmacy falls within it. The term "negative easement" can not be construed in such an expansive way.

To the extent Consolidated's promise relates in any way to the land, the relationship is too tenuous to be treated as a basis for establishing an interest in land. At most, Consolidated made a covenant that it would not sell certain products. This is not analogous to the agreements that are conventionally referred to as negative easements. Negative easements are especially viewed as vehicles to assure the owner of the dominant estate that the owner of the servient estate will not interfere with the flow of air or light to, or the subjacent or lateral support of the dominant estate. Restatement of Property § 452 comment a.[4] Treating Consolidated's promise not

4. We also find few meaningful similarities between Consolidated's promise not to compete and the negative easement we recognized in *Simplex Precast Industries, Inc. v. Biehl*, 395 Pa. 105, 149 A.2d 121 (1959). In that case, an owner of three contiguous pieces of property sold one lot whose deed indicated that a cul-de-sac on the property would be temporary. We said this created a negative easement which operated to prevent the two remaining lots from being sold without the road first being extended. The theory was that the cul-de-sac would

to compete as a negative easement would go beyond what the Restatement contemplates. Since Consolidated's promise to Thatcher's does not qualify as an interest in land, neither the Statute of Frauds nor any of its exceptions applies to this case.

Consolidated also argues that Thatcher's has failed to prove all the elements of the doctrine of estoppel by clear, precise and unequivocal evidence. Thatcher's submits that it established all the requirements of estoppel and, therefore, the Superior Court was correct to apply it.[5]

The theory upon which Thatcher's sought relief was a claim of "promissory estoppel." The trial court found that Consolidated gave assurances to Thatcher's that it "had no intention of opening a pharmacy." However, that promise was not supported by consideration. Such a naked promise is generally not legally enforceable. However, under the doctrine of promissory estoppel, there is an exception to this general rule. Under this theory,

> [a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

become permanent unless the previous owner was required to extend it before selling his other two lots.

5. Since the beginning of this case, Thatcher's consistently argued that it reasonably, foreseeably and detrimentally relied on Consolidated's assurances, inducing Thatcher's to renew its ten-year lease. These facts, if accepted by the fact finder, would clearly establish a claim of estoppel as a basis for relief. Thatcher's states that its Complaint sets forth a claim for "promissory estoppel," but it was not so titled. Appellee's Brief at 26. Thatcher's submits that the Chancellor used the term "equitable estoppel" instead of "promissory estoppel" to refer to the theory upon which it sought relief. However, that does not change the fact that Thatcher's theory, under whatever name one might assign to it, was one it never abandoned nor from which it ever retreated. As a result, all parties were aware of the claim and had an opportunity to litigate it. Therefore, Thatcher's has preserved its right to have its claim of estoppel reviewed on appeal. To hold otherwise would be to elevate form over substance.

Restatement (Second) Contracts § 90(1). The doctrine of promissory estoppel is the law in Pennsylvania. *Central Storage & Transfer Co. v. Kaplan,* 487 Pa. 485, 410 A.2d 292 (1979). A party asserting a claim of estoppel has the burden of establishing all the essential elements. *Funds for Business Growth, Inc. v. Maraldo,* 443 Pa. 281, 288, 278 A.2d 922, 926 (1971). One of those elements is that enforcement of the promise must be necessary to avoid injustice. Significantly,

> [s]atisfaction of [this] requirement may depend on the reasonableness of the promisee's reliance, on its definite and substantial character in relation to the remedy sought, on the formality with which the promise is made, on the extent to which the evidentiary, cautionary, deterrent and channeling functions of form are met by the commercial setting or otherwise, and on the extent to which such other policies as the enforcement of bargains and the prevention of unjust enrichment are relevant.

Restatement (Second) Contracts § 90, comment b. Several of the considerations listed in comment b are relevant to this case, and we factor them into the analysis of Thatcher's claim.

Before doing so, we note that this Court is bound by the trial court's findings of fact, unless those findings are not based on competent evidence. *2401 Pennsylvania Ave. Corp. v. Federation of Jewish Agencies of Greater Philadelphia,* 507 Pa. 166, 172, 489 A.2d 733, 736 (1985). Moreover, absent an abuse of discretion, this Court is bound by the trial court's assessment of the credibility of the parties. *Wagner v. Wagner,* 466 Pa. 532, 538, 353 A.2d 819, 822 (1976). However, the trial court's conclusions of law are not binding on an appellate court, whose duty it is to determine whether there was a proper application of law to the facts by the trial court. *2401 Pennsylvania Ave.,* 507 Pa. at 172, 489 A.2d at 736. We are constrained, for the reasons that follow, to conclude that Consolidated's "promise" is not enforceable.

There are three interrelated reasons for rejecting Thatcher's claim: Thatcher's reliance was unreasonable; nothing was done to formalize the promise; and no evidentiary,

cautionary or deterrent functions were met under the circumstances. First, it was error for the trial court to conclude that, as a matter of law, Thatcher's acted reasonably in relying on Consolidated's representation that it did not intend to operate a pharmacy. Under the terms of its lease, Consolidated had a clear right to do so.[6] Additionally, Thatcher's lease specifically provided that any part of the shopping center already being used as a supermarket, which included Consolidated, was exempt from the clause prohibiting another store from selling drugs and medical supplies.

The language of the two lease agreements clearly reserved Consolidated's right to operate a pharmacy. Under the particular circumstances of this case, where Thatcher's sought ten years of protection from a source of potential competition with whom it had a less than amicable relationship, it was unreasonable for Thatcher's to proceed on the basis of indefinite oral assurances.[7]

In view of the relationship between the parties and the nature and duration of the promise, any agreement not to compete should have been formalized. Proceeding in such a manner would have memorialized the occasion and reduced the possibility that the terms of the agreement would be misunderstood. As a business entity operating in the commercial setting, Thatcher's showed poor judgment when it decided to renew its ten-year lease and forgo its opportunity to relocate on the basis of an indefinitely worded promise uttered in an informal conversation with a potential competitor.

The second factor which weighs against enforcing the oral promise is the fact that it was made with relative informality. The record shows that, after receiving a telephone call from Ronald Zukin, Thatcher's president and sole proprietor, Jo-

6. The only restriction was that any pharmacy, together with the store's other non-food operations, account for no more than twenty percent of the store's floor space.

7. The statement "we have no intention of opening a pharmacy" is indefinite on its face and does not provide any absolute guarantee of what may or may not happen in the future. It reflects the speaker's current state of mind, which is subject to change.

seph Greenblatt, Consolidated's comptroller, stopped by to see Zukin. At that meeting, Zukin informed Greenblatt that: (1) he had been offered a new lease; (2) he had a lease at another location for ten years; and (3) he wanted assurances that Consolidated was not going to open a pharmacy. The trial court accepted Zukin's testimony that Greenblatt replied, "we have no intention of opening a pharmacy." (N.T. 5/7/87, Zukin, p. 27). Even accepting, as we must, that this is an accurate recounting of the discussion that occurred, it fails to reflect the degree of formality one would expect when business rivals operating in a commercial setting have rights at stake as important as the freedom to enter a new line of business and the choice of where to locate for a ten-year period of time. Despite the gravity of these matters, the record fails to reveal that the parties even so much as shook hands to formalize their agreement. This weighs against enforcing any promise. Restatement (Second) Contracts § 90, comment b.

Finally, the absence of a written agreement and any other formalities prevented critical evidentiary, cautionary, and deterrent functions from being performed. Here the factual predicate must be drawn solely from the testimony of Zukin and Greenblatt to determine the existence of any promise and its terms. The evidentiary problems created by this situation are made apparent by the very fact that this case is in essence a credibility dispute between Zukin and Greenblatt. Under the circumstances, the terms of the agreement were vague and at risk of being misunderstood. This prevented the parties from exercising the caution demanded by a situation in which each had significant rights at stake. Not being able to appreciate the seriousness of their actions, the parties were not deterred from making ill-considered promises.

It is this Court's view that the combination of the specific factual circumstances of this case weighs against enforcing any promise Consolidated made not to open a pharmacy.

Accordingly, the Order of the Superior Court is reversed, and the injunction entered by the Court of Common Pleas of Chester County is hereby dissolved.

LARSEN and McDERMOTT, JJ., did not participate in the decision of this case.

ZAPPALA, J., concurs in the result.

PAPADAKOS, J., files a dissenting opinion.

PAPADAKOS, Justice, dissenting.

Consolidated Supermarkets, Inc. (Consolidated) appeals from the Order of the Superior Court affirming the order of the Court of Common Pleas of Chester County which enjoined Consolidated from operating a pharmacy in the West Goshen Shopping Center (the Shopping Center). For the following reasons, I dissent.

This case was commenced on April 29, 1987, by Appellee, Thatcher's Drug Store of West Goshen, Inc. (Thatcher) which for fourteen years prior thereto had been operating a pharmacy immediately adjacent to Consolidated's Shop–Rite Supermarket in the Shopping Center.

On October 29, 1965, Consolidated entered into a long-term lease with the then owner, Enal Productions, (Landlord) to open a Shop–Rite supermarket as an "anchor" store for the Shopping Center. Under the terms of the lease, Consolidated was prohibited from using more than twenty percent of its selling space for the sale of "non-food" items.

In September, 1973, Thatcher entered into a ten year lease with Landlord to open a pharmacy in the store immediately adjacent to the Shop–Rite supermarket. The lease contained the following paragraph protecting Thatcher from competition within the Shopping Center:

Landlord shall not lease any store within the premises for use as a drug store or pharmacy or for the sale of medical equipment or prosthetic supplies. The foregoing restriction shall not apply to any of the shopping center presently used as a supermarket or department store.

The lease also prohibited Thatcher from selling any "food."

In 1976, Thatcher installed a refrigeration case from which it sold milk. In response, Consolidated posted a sign in front

of the supermarket announcing that: "Coming soon—a Shop Rite pharmacy." Upon seeing the sign, Ronald Zukin, the president and sole shareholder of Thatcher, contacted Joseph Greenblatt, the controller and vice-president of Consolidated. Mr. Zukin asked Mr. Greenblatt why the sign announcing the coming of a Shop–Rite pharmacy was in the window, Mr. Greenblatt responded, "We don't want you in the dairy business," referring to Thatcher's recent selling of milk. After some discussion, Mr. Greenblatt said, "You get out of the dairy business and we won't open a pharmacy." Within a week, Thatcher removed the refrigeration case, and, in response, the supermarket immediately removed the pharmacy announcement.

In 1983, nearing the end of Thatcher's ten year lease, Mr. Zukin approached Landlord about securing a ten year renewal. Mr. Zukin was informed that Consolidated desired Thatcher's space to use as a Shop–Rite pharmacy and that renewal would not be offered to Thatcher. As a result, Mr. Zukin located an alternative site for the pharmacy three blocks from the Shopping Center. Mr. Zukin, with his attorney, negotiated a lease at the new location, drew a deposit check, and was prepared to finalize the deal. Before finalizing that deal, Mr. Zukin had a conversation with Landlord and was advised that Consolidated had changed its mind about taking Thatcher's space and that a renewal would be offered to Thatcher.

When Mr. Zukin received the proposed renewal, he met with Mr. Greenblatt to seek assurances that Consolidated would not open a competing pharmacy. Mr. Zukin testified that Mr. Greenblatt's direct response was, "We don't hurt the little guys. We have no desire to want to hurt you and we have no intention of opening a pharmacy." Mr. Greenblatt admitted in testimony that this meeting took place but denied making such a statement. Mr. Zukin also testified that at the time of the meeting he was aware of Consolidated's lease restriction concerning "non-food" items (i.e., not more than 20% of the selling space) and was aware that the supermarket as then constituted was at or near its "non-food" limits.

Based on the assurances he received from Mr. Greenblatt, Mr. Zukin executed a ten year renewal in late 1983.

Within the next year, Mr. Greenblatt became aware that Thatcher's had a "Beverage Center" in front of its store. In response, a sign was again posted in the supermarket window announcing "Shop Rite Pharmacy coming soon." Again, Mr. Zukin contacted Mr. Greenblatt, who advised him that Consolidated did not want Thatcher to go into the soda business and if Mr. Zukin would take his beverage center sign down, "we won't be in the pharmacy business." Within a few days, Mr. Zukin removed the beverage center sign and, immediately thereafter, the Shop–Rite pharmacy announcement was removed.

In 1985, Consolidated secured the rental space immediately adjacent to the supermarket, on the side opposite of Thatcher's. Thereafter, Consolidated removed the partition wall between the supermarket and the new space and secured the federal and state licenses necessary to operate a pharmacy. Aware of Consolidated's imminent plans to open a pharmacy, Thatcher filed the instant action seeking to enjoin Consolidated from implementing its plans.

Thatcher presented three grounds in its complaint in support of its request for injunctive relief: (1) breach of the lease between Consolidated and Landlord; (2) breach of an oral contract between Consolidated and Thatcher; (3) estoppel based upon an oral promise and detrimental reliance. The trial court conducted an evidentiary hearing on May 7 and 8, 1987. At the hearing, the breach of lease argument was rejected by the trial court and the oral contract theory was abandoned by Thatcher. The trial court ruled in favor of Thatcher on the grounds of equitable estoppel and entered a decree nisi enjoining Consolidated from operating a retail, prescription pharmacy on the premises of the West Goshen Shopping Center.

Consolidated filed exceptions to the trial court's order claiming, *inter alia,* that the Statute of Frauds [1] rendered any

1. The Statute of Frauds provides in pertinent part that:

agreement between the parties unenforceable. In its "opinion sur exceptions," the trial court upheld its decision on the basis of equitable estoppel but also determined that the Restatement of Property (Second) Section 524 [2] provided an applicable exception to the Statute of Frauds defense. The trial court denied Consolidated's exceptions and entered a final order. On appeal, the Superior Court, like the trial court, determined that the Restatement of Property (Second) § 524 provided an applicable exception to the Statute of Frauds defense and this Court granted Consolidated's petition for allowance of appeal.

In my view, the Statute of Frauds and the Restatement of Property (Second) § 524 are irrelevant to the disposition of this case. I agree with the majority that the oral promise between Thatcher and Consolidated did not create an "interest in land" so as to bring it under the purview of the Statute of Frauds. The cases cited by Consolidated to show that the oral promise created an "easement" are inapposite. Both *Burns v. Baumgardner*, 303 Pa.Superior Ct. 85, 449 A.2d 590 (1982), and *Haines v. Minnock Construction Co.*, 289 Pa.Superior Ct. 209, 433 A.2d 30 (1981), involved oral promises for building and height restrictions (easements) between the developers of tracts of land and purchasers. There is no such property right between Consolidated and Thatcher in this case, but, instead solely an oral promise not to compete. I disagree, however, that the evidence submitted to the Chan-

any uncertain interest ... in ... lands, tenements or hereditaments, made or created by ... parol, and not put in writing, and signed by the parties so making or creating the same ... shall have the force and effect of leases or estates at will only, and shall not either in law or equity, be deemed or taken to have any other or greater force or effect....
Act of March 21, 1772, 1 Sm.L. 389, § 1, 33 P.S. § 1.

2. **Promises Enforceable by Estoppel.**
An oral promise or representation that certain land will be used in a particular way, though otherwise unenforceable, is enforceable to the extent necessary to protect expenditures made in reasonable reliance upon it.
Restatement of Property (Second) § 524.

cellor does not establish Thatcher's right to estop Consolidated from opening a competing pharmacy.

In Pennsylvania, the doctrine of equitable estoppel has been utilized as a means for enforcing oral promises.[3] *See, e.g., Ridley Park Shopping Center v. Sun Ray Drug Co.,* 407 Pa. 230, 180 A.2d 1 (1962); *Ervin v. Pittsburgh,* 339 Pa. 241, 14 A.2d 297 (1940).

> Equitable estoppel is a doctrine that prevents one from doing an act differently than the manner in which another was induced by word or deed to expect. A doctrine sounding in equity, equitable estoppel recognizes that an informal promise implied by one's words, deed or representations which leads another to rely justifiably thereon to his own injury or detriment, may be enforced in equity.

*Novelty Knitting Mills, Inc. v. Siskind,* 500 Pa. 432, 433, 457 A.2d 502, 503 (1983). The essential elements of equitable estoppel are inducement and justifiable reliance on that inducement to one's detriment. *Id.* Moreover, the party asserting the estoppel has the burden of establishing the estoppel by clear, precise and unequivocal evidence. *See, Blofsen v. Cutaiar,* 460 Pa. 411, 333 A.2d 841 (1975).

In the instant case, the trial court, after hearing from the principals, found credible [4] Mr. Zukin's testimony that he met with Mr. Greenblatt who, in response to Mr. Zukin's request for assurances, stated: "We don't hurt the little guys. We have no desire to want to hurt you and we have no intention of opening a pharmacy." The trial court found incredible Mr. Greenblatt's assertion that he did not make such a statement. The trial court also found that Mr. Zukin knew from his prior dealings that Mr. Greenblatt had previously (in 1976) honored his promise to stop plans to open a pharmacy if Thatcher would not sell milk by removing signs announcing the opening of a pharmacy; and that Mr. Zukin knew, based on his

---

3. In this Commonwealth, the concepts of equitable estoppel and promissory estoppel are used interchangeably.

4. This Court is bound by the trial court's findings regarding the credibility of the witnesses. *See, Wagner v. Wagner,* 466 Pa. 532, 353 A.2d 819 (1976).

knowledge of the supermarket layout and the terms of its lease, that the supermarket was at or near its maximum level of available selling space for non-food items. Under these circumstances, it was reasonable for Thatcher to believe that Consolidated would honor its oral promise not to compete and to act in reliance thereon.

In relying upon Consolidated's oral promise, Thatcher relinquished its proposed lease at an alternative location and obligated itself to Landlord for an additional ten year term. Consolidated's direct competition with Thatcher would have undoubtedly caused substantial injury to, or forced Thatcher out of business—a harm which could only be avoided by enforcing the promise not to compete. The lower court was correct in determining that Thatcher established its estoppel claim by clear, precise and unequivocal evidence.

I, therefore, dissent and would affirm the order of the Superior Court.