J-E04005-14

2015 PA Super 137

FAYE M. MORANKO, ADMIN. OF THE
ESTATE OF RICHARD L. MORANKO,
DECEASED

        Appellant

        v.

DOWNS RACING, LP, D/B/A MOHEGAN
SUN AT POCONO DOWNS

        Appellee

IN THE SUPERIOR COURT OF
PENNSYLVANIA

No. 192 MDA 2013

Appeal from the Order January 4, 2013
In the Court of Common Pleas of Luzerne County
Civil Division at No(s): 2011-CV-10312

BEFORE:  GANTMAN, P.J., FORD ELLIOTT, P.J.E., BENDER, P.J.E.,
          PANELLA, J., DONOHUE, J., SHOGAN, J., MUNDY, J., OLSON, J.,
          and OTT, J.

DISSENTING OPINION BY MUNDY, J.:        **FILED JUNE 10, 2015**

I respectfully dissent. I agree with the esteemed Majority that the issue in this case is whether Appellee (Mohegan Sun) owed a duty of care to Richard Moranko (Decedent). Majority Slip Opinion at 1-2. However, I disagree that the trial court properly concluded, as a matter of law for the purpose of summary judgment, that no duty was owed under the facts of this case. I do not believe we need to reach the issue of first impression articulated by the Majority, *i.e.*, what inherent duty, if any, a valet service owes to a visibly intoxicated patron when returning that person's vehicle. Rather, under the particular facts of this case, construed in a light most favorable to Appellant, Faye Moranko, the non-moving party, as our

standard of review requires, I conclude Mohegan Sun assumed such a duty as part of its internal organizational and operational policies. **See E.R. Linde Constr. Corp. v. Goodwin**, 68 A.3d 346, 349 (Pa. Super. 2013). I reach my conclusion based on this Commonwealth's adoption of Section 323 of the Restatement (Second) of Torts (1965) (recognizing the existence of a duty to others for voluntarily assumed undertakings).

I believe the Majority's determination that Moranko waived her argument relative to Mohegan Sun's duty on the theory described in Section 323 of the Restatement is unwarranted. In her answer and brief in opposition to Mohegan Sun's motion for summary judgment, Moranko raised and argued the substance of this claim. In her response to the motion, Moranko stated the following. "Given the facts and circumstances of this case, which include but are not limited to, the Mohegan Sun Casino having its own policies and procedures with regard to visibly intoxicated guests, a duty exists in this matter and the same was breached." Plaintiff's Response to Defendant's Motion for Summary Judgment, 8/16/12, at 2, ¶ 10. Furthermore, in her brief in opposition to the motion, Moranko related facts from deposition testimony supporting the existence of a duty based on this theory. Brief in Support of Plaintiff's Response to Defendant's Motion for Summary Judgment, 8/16/12, at 6-12. Moranko concluded, "[d]espite all of the aforementioned polices [sic] and procedures regarding visible intoxication, the employees of the Mohegan Sun on the night in question

failed to implement any of them …."  Brief in Support of Plaintiff's Response to Defendant's Motion for Summary Judgment, 8/16/12, at 6-12.

When advancing this argument on appeal before the prior panel of this Court, Moranko cited, albeit mistakenly, to Section 324A of the Restatement (Second) of Torts, which, as the Majority notes, pertains to the duty of care owed by a principal to third persons, resulting from the principal's voluntarily undertaken policy or action.  Majority Slip Opinion at 5-6.  The substance of Moranko's argument, however, was clearly relevant to an application of Section 323.  **See** Moranko's Brief at 15-17.

Thus, the essence of Moranko's argument, that Mohegan Sun owed Decedent a duty of care based on its own internal policies, has been consistently presented to both the trial court and this Court with full opportunity for Mohegan Sun to respond.  Our Supreme Court has held that a mere erroneously labeled claim will not require waiver on appeal.

> However, [mistitling] does not change the fact that [Appellant's] theory, under whatever name one might assign to it, was one it never abandoned nor from which it ever retreated.  As a result, all parties were aware of the claim and had an opportunity to litigate it.  Therefore, [Appellant] has preserved its right to have its claim … reviewed on appeal.  To hold otherwise would be to elevate form over substance.

***Thatcher's Drug Store of W. Goshen, Inc. v. Consol. Supermarkets, Inc.***, 636 A.2d 156, 159 n.5 (Pa. 1994).  For these reasons, I do not consider the argument waived and will proceed to address its merits.

The Majority states, "[t]his internal policy of Mohegan Sun is aimed not at preventing their valets from withholding an automobile from a visibly intoxicated patron, but from keeping visibly intoxicated patrons from gambling on the casino gaming floor." Majority Slip Opinion at 7. From this, the Majority concludes the policies cannot create a duty on Mohegan Sun toward Decedent. *Id.* I disagree that the policies at Mohegan Sun were so circumscribed.

During discovery, Appellant deposed Dennis Driscoll, the Director of Security and Transportation for Mohegan Sun. Brief in Opposition to Motion for Summary Judgment, 8/16/12, Exhibit I, N.T., 1/9/12. Appellant questioned Driscoll about the training provided and policies pursued by Mohegan Sun respecting intoxicated patrons. *Id.* at 15-30.

> [Attorney for Appellant]. Do [Mohegan Sun security guards] receive training as to spotting an individual who is visibly intoxicated?
>
> [Dennis Driscoll]. Yes.
>
> Q. What kind of training do they receive and who [sic] would they receive that from?
>
> A. Well, they receive it from both, you know, internally with a supervisor but also they attend a class. It's called a RAMP class, Responsible Alcohol Management Program.
>
> Q. So all of your security guards attend the RAMP class?
>
> A. To a degree. We maintained an over 50 percent staffing level that is trained in it. I would

say it's probably — it's maintained probably about a 70 to 80 percent.

Q. And why is it important for security guards to have an understanding of the RAMP program and to spot patrons who are visibly intoxicated?

A. The main responsibility -- the main reason for that is because the gaming -- gaming requires that w[e] deny individuals from entering or remaining present on the gaming floor if they are intoxicated. It's one of the main responsibilities so we have to remove the individual from the gaming floor.

*Id.* at 15-16.

Driscoll further testified about the procedures security personnel are to follow upon noticing an intoxicated patron and the purpose behind those procedures. Driscoll testified specifically as follows.

[Attorney for Appellant]. And what are they to do with a guest who is visibly intoxicated?

[Dennis Driscoll]. Well, the first thing that they do is they will contact Security dispatch -- that's the command center -- to report it, contact a supervisor and also contact surveillance.

And at that point the officer, we make an attempt to get the individual off the gaming floor, wait for a supervisor to arrive and he will confirm whether the individual appears to be intoxicated. At that time --

…

And at that point we explain to the individual that we feel that they are intoxicated and that we would no longer allow them to the gaming floor **and**

**actually the house policy is that we try to get the individual home safely**.

> Q.    So is it fair to say that it doesn't stop at just telling them they can't gamble anymore?
>
> A.    Oh, no.

*Id.* at 17-18 (emphasis added).

Driscoll testified that security personnel endeavor to dissuade intoxicated patrons from driving, attempt to secure alternate transportation, and, if unsuccessful, alert police. *Id.* at 18, 22, 27. Driscoll testified that most instances are handled by security personnel before a patron proceeds to the valet service. However, he also testified that the valet service personnel are instructed to watch for signs of intoxication and report the same to security. *Id.* at 29-30.

> Q.    When you say stall giving them their car, is it fair to say that you have the -- within the valet system you have the power to stall because you're ultimately bringing the car back; right?
>
> A.    That's correct.
>
> …
>
> Q.    Now, we have been talking about signs of visible intoxication. What is your understanding both in what you've been instructed and what you personally instruct on for signs of visible intoxication?
>
> A.    The basic signs are somebody who staggers in their walk or somebody who slurs in their speech.

Q. And is it your understanding that the valet runners and the hosts at the guest kiosk center would be instructed on that?

A. They are.

Q. And why is that important for them to be instructed on that?

A. Well, simply because we don't want someone to get in their car that seems to be intoxicated.

*Id.* at 23-24.

In addition to the deposition of Driscoll, Nicholas G. Keeler, a valet employed by Mohegan Sun, was deposed. Brief in Opposition to Motion for Summary Judgment, 8/16/12, Exhibit J, N.T., 5/9/12. In his testimony, Keeler related that he was trained to identify indications of intoxication and to report any encounters to a supervisor. *Id.* at 8-10.

Q. At any point in time when you're being trained by the valet that you're kind of shadowing there, did they ever discuss with you what to do if you encounter a visibly intoxicated patron trying to get their vehicle?

A. Yes. We are supposed to inform our supervisor via radio.

Q. Does that instruction that you just told me, does that come from the valet who is training you?

A. No.

Q. Who does that instruction come from?

A. That's basically from Tecio [Baldoni, a supervisor,] himself. If you see somebody that's

- 7 -

intoxicated or any kind of disturbances, you know, in your surroundings, let one of us know.

Q. And that's something that would have been told to you in your initial meeting with Tecio?

A. Yes.

Q. After you were hired?

A. Yes.

Q. What types of things did Tecio tell you to look for in terms of someone who is visibly intoxicated?

A. Stumbling, slurred speech — what's the word I'm looking for — disoriented, you know.

Q. And can that be someone who is actually getting their vehicle where you're the runner and you're about to give the vehicle to them and you see those signs?

A. Yeah.

Q. And your duty, then, is to call the supervisor?

A. First of all, we would ask them, *Are you okay to drive?  Do you want to come in for a cup of coffee?  We can give you a ride home, call a cab.*

If they argue, there's nothing we can do.  You know, if it's that bad where I – they're visibly intoxicated, I would call Tecio.

Q. You would call Tecio?

A. Tecio or another supervisor on duty.

Q. Would you call that supervisor before letting the person get into the vehicle?

> A. Yes. If they were visibly intoxicated,
> yes.

*Id.* (italics in original).

Based on the foregoing, I conclude that the internal policy of Mohegan Sun was not limited to keeping intoxicated patrons from the gambling floor. Rather, the policy was broader and encompassed its admitted goal to protect intoxicated patrons from driving. To that end, Mohegan Sun employees, including but not limited to valets, were trained and instructed, *inter alia*, to look for indications of intoxication among patrons, advise intoxicated patrons that alternative transportation could be arranged, and if unsuccessful in persuasion, notify the appropriate police department. Thus, Mohegan Sun voluntarily assumed to render security services designed to protect patrons from the dangers of driving while intoxicated.

Pennsylvania, by adopting Section 323 of the Restatement (Second) of Torts, recognizes that a duty may be found in a party who voluntarily assumes an undertaking. ***Unglo v. Zubik***, 29 A.3d 810, 813 (Pa. Super. 2011). Section 323 specifies as follows.

### § 323 Negligent Performance of Undertaking to Render Services

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

> (a) his failure to exercise such care increases the risk of such harm, or
>
> (b) the harm is suffered because of the other's reliance upon the undertaking.

RESTATMENT (SECOND) OF TORTS (1965) § 323. A plaintiff need not satisfy both Subsections (a) and (b). Establishing either will suffice. **Feld v. Merriam**, 485 A.2d 742, 746 n.4 (Pa. 1984).

> It is made clear at the outset of [] section [323] that the duty to exercise care arises when 'one … undertakes, gratuitously or for consideration to render services to another which he should recognize as necessary for the protection of the other's person or things …'. The language of the subsections clearly reveals they were intended not to apply to scope of duty but to causal connection between the physical harm and defendant's failure to exercise reasonable care. Subsections (a) and (b) permit that causal connection to be proved by evidence that defendant's failure increased the risk of such harm as was suffered by plaintiff or by evidence that the harm was suffered because of reliance on the defendant's undertaking.

**Hamil v. Bashline**, 307 A.2d 57, 61 (Pa. Super. 1973) (**Bashline I**).[1]

> We agree with the view of the Superior Court majority expressed in **Bashline I** that the effect of § 323(a) is to relax the degree of certitude normally required of plaintiff's evidence in order to make a case for the jury as to whether a defendant may be held liable for the plaintiff's injuries: Once a plaintiff has introduced evidence that a defendant's negligent

---

[1] **Bashline I** was overruled on other grounds by this Court in a subsequent appeal at **Hamil v. Bashline**, 364 A.2d 1366 (Pa. Super. 1976) (**Bashline II**). Our Supreme Court in turn reversed **Bashline II** while approving the analysis of the **Bashline I** Court relative to its interpretation of Section 323(a). **Hamil v. Bashline**, 392 A.2d 1280, 1286 (Pa. 1978).

act or omission increased the risk of harm to a person in plaintiff's position, and that the harm was in fact sustained, it becomes a question for the jury as to whether or not that increased risk was a substantial factor in producing the harm.

***Hamil v. Bashline***, 392 A.2d 1280, 1286 (Pa. 1978).

"…Thus where it appears How an accident happened and also that the victim Might have saved himself by taking advantage of a precaution which it has been shown defendant negligently failed to afford, courts have generally let a jury find whether the precaution would in fact have saved the victim." ***Id.*** at 1287, *quoting* F. Harper and F. James, The Law of Torts, Vol. 2, § 20.2, at 1113 (1956) (emphasis in original).

Of specific relevance to the facts in this case, our Supreme Court has recognized that voluntarily providing a program of security may create a duty under Section 323. ***Id.*** at 746 (holding that a landlord who voluntarily established a security program for an apartment complex could create a duty of care to tenants for the proper conduct of that program under Section 323, even though the landlord was not otherwise contractually bound to do so under the lease with tenants).

For the foregoing reasons, I would reverse the trial court's January 4, 2013 order granting summary judgment to Mohegan Sun. I express no opinion relative to the issue of first impression addressed by the Majority, concerning the duty of valet services in general to intoxicated patrons, as I deem the issue moot under the particular facts of this case.

PJE Bender and Judge Donohue join this Dissenting Opinion.