## Chen v. Shum

C.P. of Lancaster County, no. CI-07-02798.

*Kirk V. Wiedemer,* for plaintiffs.
*Robert W. Hallinger,* for defendants.

ASHWORTH, *J.,* January 25, 2011—Defendants have filed a direct appeal to the Superior Court of Pennsylvania from the molded verdict entered in this case on November 24, 2010. This opinion is written pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure.

## I. BACKGROUND

The evidence in the non-jury trial established the following facts. On August 15, 2005, plaintiff Hua Ming Chen, defendant Swee Hong Yap, Li Xue Shum, and Kan Ke Shum formed a Pennsylvania business corporation for the purpose of owning and operating a restaurant, to be known as Olive & Jasmine Asian Bistro, Inc. ("Olive & Jasmine"), at 2323 Lincoln Highway, Lancaster, Pennsylvania. (Notes of Testimony ("N.T.") at 25-29; Joint Exhibit Nos. 1, 2 & 3.) Two hundred shares of stock were issued to the original incorporators: Yap was issued a 34 percent share and was named President and Treasurer;

Chen was issued a 33 percent share; Li Xue Shum was issued a 28 percent share and was named Secretary; and Li Xue Shum's ex-father-in-law, Kan Ke Shum, was issued a 5 percent share. (*Id.* at 18, 25-27, 29-30, 89, 165; Joint Exhibit Nos. 1, 2 & 5.) Yap received the greater share in the stock because "[h]e was the leader" of the corporation, "the boss" who "handle[d] money matters."[1] (*Id.* at 19; see also 289-90.) Kan Ke Shum, who had been in the restaurant business for over 30 years, was made a limited investor because of his good credit history. (*Id.* at 20, 100-01; see also Wai Hong Shum Deposition at 10-14.) Chen was to be the chef for the restaurant. (*Id.* at 63.)

The four original shareholders were made members of the board of directors. (N.T. at 25; Joint Exhibit No. 1.) Board meetings were held and minutes generated. (*Id.*; see also Joint Exhibit Nos. 1 and 5.) Chen, Yap and Li Xue Shum were each expected to contribute between $60,000.00 and $100,000.00 toward the restaurant project, depending on the start-up costs. (*Id.* at 19, 38, 165, 169.) Kan Ke Shum, on the other hand, made a total investment of just $14,000.00. (*Id.* at 171, 249.)

In July 2005, prior to the incorporation, three of the four partners, Chen, Yap, and Li Xum Shum entered into a lease agreement for the property at 2323 Lincoln Highway that was to be their restaurant, Olive & Jasmine. (N.T. at 21.) Chen wrote a check on July 22, 2005, in the amount of $11,645.84 for the first two months of rent on the Lincoln Highway property. (*Id.* at 22-23; Joint Exhibit No. 4.)

1. All parties testified that it was Yap who presented the idea of opening a restaurant to Chen and Li Xum Shum. (N.T. at 17, 86, 185, 233-34.)

Between January and October 2006, Yap and Chen worked full-time remodeling the property at 2323 Lincoln Highway to accommodate the new restaurant. (N.T. at 30-33.) During that time, Yap, Li Xum Shum and Chen were making capital investments in the business to pay for the remodeling and start-up costs. (*Id.* at 34-41, 165-66, 249-50.) There were no receipts kept by the corporation for these expenses; Yap, however, tracked expenses on monthly spreadsheets. (*Id.* at 168, 239, 281-82, 286-87; Joint Exhibit No. 13.) According to these records, by September 30, 2006, expenses for the project totaled $262,309.73 (*Id.* at 245); by October 20, 2006, expenses were $285,703.15. (*Id.* at 239, 243.)

Between November 2005 and October 5, 2006, Chen invested $88,000.00 in Olive & Jasmine. (N.T. at 36-37, 45-46; Joint Exhibit Nos. 4, 7, & 8.) Chen made contributions by check totaling $43,000.00 as follows:

a. $11,645.84 check, dated 9/22/05;

b. $3,354.16 check, dated 11/23/05;

c. $4,000.00 check, dated 3/6/06;

d. $6,000.00 check, dated 3/6/06;

e. $10,000.00 check, dated 7/20/06; and

f. $8,000.00 check (a third-party check from a stock trading account negotiated over to Yap in July 2006). (*Id.* at 37-42, 85; joint exhibit Nos. 4 & 8.)

Chen additionally made cash contributions totaling $45,000.00 to Olive & Jasmine as follows:

a. $18,000.00 on November 23, 2005;

b. $10,000.00 on an unspecified date;

c. $6,000.00 on an unspecified date; and

d. $11,000.00 "in small amounts" on unspecified dates, the last of which was sometime in September 2006. (*Id.* at 42-44.)

Chen received no receipts from the corporation for these cash contributions. (*Id.* at 76, 297.)

Yap and Li Xue Shum also made large cash contributions to the corporation and have no receipts. (N.T. at 169, 212, 295.) Yap, as treasurer of the corporation, gave no receipts (*Id.* at 76, 212, 297), and failed to keep accurate records of the cash contributions made by the shareholders. (*Id.* at 187-88, 281-82, 295, 297.)

During the remodeling, Yap brought up the idea of obtaining a liquor license for the restaurant as a way to increase business and profits. (N.T. at 32-33.) Yap and the corporation's attorneys at Russell Krafft & Gruber, LLP, contacted the Pennsylvania Liquor Control Board in an effort to renew the expired liquor license held by shareholder Kan Ke Shum and used at a restaurant previously owned and operated by Kan Ke Shum. (*Id.* at 34, 79, 100-01, 142-44.) Chen was told by Yap that a non-citizen could not apply for a liquor license.[2] (*Id.* at 32, 33,

---

2. Section 403(b) of the Liquor Code, 47 P.S. § 4-403(b), requires that an applicant for a retail license who is a natural person must be a United States citizen and a Pennsylvania resident for at least two years preceding his/her application. If the applicant is a corporation, all of its officers, directors, and stockholders must be United States citizens. 47 P.S. § 4-403(c).

Despite the language of the Liquor Code, however, a 1974 Attorney General opinion stated that requiring an officer of a licensee to be a United States citizen is in violation of federal civil rights laws [42 U.S.C.A. § 1981 et seq.] and the Fourteenth Amendment to the United States Constitution. [1974 Op. Atty. Gen. No. 23]. Furthermore, the

46, 76.) Chen was not a United States citizen, nor did he possess permanent resident alien status in 2006. (*Id.* at 32, 33, 46, 59, 79-80.) Yap, though not a United States citizen, did possess permanent resident alien status in 2006. (*Id.* at 76.) At Yap's suggestion, the shareholders agreed that Chen would no longer be a corporate shareholder and that an agreement of sale of stock would be drafted wherein Chen would sell his shares to defendant Wai Hong Shum, Li Xum Shum's ex-husband[3] and the son of shareholder Kan Ke Shum.[4] (*Id.* at 49-50, 59.)

In order to protect his investment in the restaurant, Chen had Yap prepare, on October 4, 2006, a document which confirmed Chen's $88,000.00 contribution. It was signed

---

United States Supreme court case, *Bernal v. Fainter*, 467 U.S. 216, 104 S.Ct. 2313, 81 L. Ed.2d 175, (1984), held that any discrimination based on alienage would be reviewed under strict scrutiny. Finally, section 1983 of the United States Code [42 U.S.C.A. § 1983] gives a person deprived of any rights, privileges or immunities secured by the United States Constitution and laws by another person operating under color of any state a right of action against the depriving party. As a result of federal law and the aforementioned rulings, [the Liquor Control Board] has consistently held that the citizenship requirements of the Liquor Code may be satisfied by United States citizenship or resident alien status with current and legitimate green cards. Visas granting temporary residency in the United States do not appear to qualify their holders for resident alien status. LCB Advisory opinion No. 03-050 (2003).

3. Li Xum Shum divorced her husband in 2002, though they continue to reside together in the same residence. (N.T. at 115, 162.)

4. Yap testified that there were two reasons for Chen wanting to sell his shares in the restaurant, neither of which involved a liquor license. First, Yap claims Chen received a letter from the Immigration and Naturalization Service (INS) in May 2006 advising him that he had to leave the country in 30 days because his green card application had been denied. (N.T. at 251.) Of course, he did not leave the country and Chen denied ever having received such a deportation letter. (*Id.* at 80-81.) Also, Yap testified that Chen's father in China had a stroke in July or August of 2006 and Chen needed to send him money. (*Id.* at 251.) Chen acknowledged that his father had suffered a stroke and was hospitalized for one week but he denied that he needed to sell his stock to raise funds for his father's medical care. (*Id.* at 72.)

by Chen, Yap and Li Xum Shum and notarized on October 5, 2006. (N.T. at 45-47, 59; Joint Exhibit No. 7.) Paragraph 1 of the document referenced the anticipated liquor license: "*Mr. Hua Ming Chen*...invested *US $88,000.00* into Olive & Jasmine Asian Bistro Corp. [sic] in order to exchange for *33 percent* of the company stock (*But, not including the liquor license, if the company gets it in the near future*)." (Joint Exhibit No. 7 (emphasis in original); see also N.T. at 47-48.) It was Chen's understanding from this language that if a liquor license was obtained, it would belong to defendant Wai Hong Shum. (*Id.* at 48.)

On October 5, 2006, Chen entered into an "Agreement of Sale of Stock in Olive & Jasmine Asian Bistro, Inc." in which Chen agreed to sell 66 shares, at a value of $1,333.32 per share,[5] to Wai Hong Shum for a total of $88,000.00 — the total capital investment by Chen as reflected in the October 4, 2006, notarized document prepared by Yap.[6] (N.T. at 51-52; Joint Exhibit Nos. 6 & 7.)

---

5. Chen testified that it was Yap who determined the per share value of $1,333.32 ($88,000.00 divided by 66 shares). (N.T. at 52.)

6. Yap testified that it was Chen who arrived at the purchase price of $88,000.00 for his stock. (N.T. at 291.) He explained that the stock was really worth $94,000.00 but Chen "want[ed] money so desperately," he was "willing to get a few thousand dollars lost [sic]." (*Id.*) And, coincidentally, "88,000 in Chinese means good luck for the next buyer," according to Yap. (*Id.*) Yap also testified that the expenses for the project through the end of September 2006 totaled $262,309.73, and that Chen's one-third share of those expenses equaled $88,000.00 at the time of the stock sale on October 5, 2006. (N.T. at 245.) (As an aside, I would note that one-third of $262,309.73 is $86,562.21, not $88,000.00.) Yap also testified that the expenses through the date the restaurant opened, October 20, 2006, totaled $285,703.15. (*Id.* at 239, 243.) According to Yap, Chen's one-third share of the total expenses as of that date equaled $94,282.03. (*Id.* at 244; see also Exhibit D-3.)

All of this inconsistent and seemingly contrived testimony by Yap is interesting but irrelevant given the fact that on October 4, 2006, Yap prepared and signed a document confirming the total contribution of $88,000.00 by Chen. This document is the best evidence of the value of Chen's interest in the restaurant.

The stock sale agreement was drafted at Yap's request by corporate counsel at Russell, Krafft & Gruber. (N.T. at 52, 103-04, 191, 252.) After the parties signed the agreement, and in the presence of counsel, Wai Hong Shum gave Chen a check in the amount of $88,000.00. (*Id.* at 53-54, 104; Joint Exhibit Nos. 9 & 9A.) Immediately upon leaving the meeting in the lawyer's office where the agreement was signed, Chen returned the $88,000.00 check to Wai Hong Shum and never received any payment for his ownership interest in the corporation. (*Id.* at 56-57, 61-62, 72, 92.)

By agreement of the shareholders, on October 5, 2006, Li Xum Shum also sold 12 percent or 24 shares of her stock in the corporation, at a value of $1,333.32 per share, to her ex-husband, Wai Hong Shum, for $33,000.00, and her remaining 16 percent or 32 shares to Yap for $44,000.00, for a total of $77,000.00. (N.T. at 54-55, 113-14, 173; Joint Exhibit No. 6.) This represented a windfall for Li Xum Shum as both she and Yap testified that she only invested a total of $57,000.00 in the restaurant. (*Id.* at 166, 210, 248.) As a result of this transfer of stock by Li Xum Shum, Wai Hong Shum became a 45 percent owner and Yap became a 50 percent owner of the stock in the restaurant.[7] (*Id.* at 115-16.)

After the October 5, 2006, meeting, Li Xum Shum returned the $44,000.00 check to Yap.[8] (N.T. at 177, 254.)

---

7. Wai Hong Shum testified that both he and Yap became 50 percent owners of the restaurant. (N.T. at 115-16.) He would only be an equal owner if he assumed control of his father's 5 percent ownership interest.

8. Li Xum Shum testified that as a 28 percent owner she was expected to cover $80,000.00 in the restaurant start-up costs. (N.T. at 166-67,169, 178.) However, 28 percent of the total expenses as of September 30, 2006, was $73,446.75, not $80,000.00. (*Id.* at 245.) Li Xum Shum also testified that because she only contributed $57,000.00

Li Xum Shum also returned the $33,000.00 check to Wai

Hong Shum following the signing of the stock purchase agreement.[9] (*Id.* at 131,174-76.) On October 5, 2006, Wai Hong Shum had only $20,000.00 in his checking account on which were written the $88,000.00 check to Chen and the $33,000.00 check to Li Xum Shum.[10] (Id. at 105, 126, 128-29.)

When the restaurant opened on October 20, 2006, Chen was the chef, Yap was the manager, Li Xue Shum was the hostess, and Wai Hong Shum was a part-time host on the

---

towards her purported share of the $80,000.00 in expenses, she "owed" Yap $23,000.00. (*Id.* at 177-78.) She explained that while she returned a $44,000.00 check for a $23,000.00 debt, Yap later sent $20,000.00 to Li Xum Shum's brother in China (*Id.* at 178-79), and gave Shum $1,000.00 in cash. (Id. at 178.) Bank statements, offered as defendants' Exhibit No. 2, actually show two checks written by Yap to Li Xum Shum totaling $3,500.00: $2,000.00 on July 21, 2006, and $1,500.00 on October 14, 2006 (the week following the stock sale).

Yap testified that he repaid Li Xum Shum the $21,000.00 he owed her by selling a house he owned in Malaysia to his cousin and transferring the money to Li Xum Shum's brother in China. (N.T. at 254-55.) No documentation exists, however, to support Yap's purported payment to Li Xum Shum's brother. (*Id.* at 215.)

9. Li Xum Shum testified that she returned the $33,000.00 check to her ex-husband, Wai Hong Shum, because she owed his father $25,000.00. (N.T. at 174-76.) As for the $8,000.00 overpayment, Li Xum Shum claimed to have received $10,000.00 in cash from her ex-husband sometime in the middle of October 2006 for her stock. (*Id.* at 175, 177.)

However, according to Wai Hong Shum, the $33,000.00 check was returned to him because Li Xum Shum owed him $15,000.00 and his father, Kan Ke Shum, $18,000.00. (N.T. at 131.) There was no testimony by Wai Hong Shum regarding a later cash payment of $10,000.00 to Li Xum Shum for the stock. To further add to this confusing and conflicting testimony, at his deposition on December 18, 2008, Wai Hong Shum stated that on October 5, 2006, he gave his ex-wife a check for $15,000.00 for her shares (as opposed to the $33,000.00 check testified to at trial) and that she presented the check for payment and deposited the funds a "few months after October 5, 2006." (See Wai Hong Shum Deposition at 103-05.)

10. Wai Hong Sum testified that he did not actually have the money to purchase the stock in Olive & Jasmine (N.T. at 102), and that it was always his intention to borrow the money from his father. (Id. at 102,107.)

weekends.[11] (N.T. at 63-64, 67, 100; see also Wai Hong Shum Deposition at 24-25.) Chen received no payment for his work as the chef at the restaurant between October 20, 2006, and January 31, 2007, because of an agreement between Yap, Chen and Li Xue Shum that they would not get paid until the restaurant started to make a profit.[12] (*Id.* at 65-66, 78.) Between October 20, 2006, and January 31, 2007, Chen also contributed an additional $7,000.00 in cash to the corporation because the restaurant was losing money. (*Id.* at 66-67, 87.)

Chen's wife, Ling Zheng, was hired as a waitress at Olive & Jasmine at a base salary of $600.00 per month, plus tips. (N.T. at 64, 90-91.) Ling Zheng worked between October 20, 2006, and January 31, 2007, without ever receiving her base salary; she did earn approximately $5,000.00 in tips. (*Id.* at 91.) Ling Zheng was fired as a waitress at the restaurant in late January 2007. (*Id.* at 67-68, 91.) Yap and Li Xum Shum offered four reasons for her termination: (1) Ling Zheng did not work well with the other employees (*Id.* at 184, 301); (2) she would "urge" customers for tips (*Id.* at 184, 263, 301); (3) "she

---

11. Yap testified, contrary to the testimony of Chen and Wai Hong Shum, that Wai Hong Shum did not start work in the restaurant until after January 1, 2007. (N.T. at 261.)

12. Both Li Xum Shum and Yap testified that after Li Xum Shum and Chen divested themselves of their shares in the restaurant, Li Xum Shum and Chen entered into a new "agreement" with Yap, at Chen's suggestion, to run the restaurant for three months to "[s]ee if we can make money from the business." (N.T. at 181, 261.) Yap testified that this was the reason Wai Hong Shum did not assume his ownership interest in the restaurant until January 1, 2007. (*Id.* at 261.) Li Xum Shum testified that she worked for one year, from October 20, 2006, through October 2007, without getting paid because the restaurant was not making a profit. (*Id.* at 181-82.) Wai Hong Shum testified at his deposition on December 18, 2008, that he had not been paid for the previous two years because the restaurant was still not making a profit. (Wai Hong Shum Deposition at 25.)

did not speak good English" and "could not communicate well with customers"[13] (*Id.*); and (4) she offered to buy the restaurant for $150,000.00, which apparently insulted Yap (*Id.* at 184, 263-64). Ling Zheng testified, on the other hand, that Yap told her she was fired because her husband was no longer a shareholder in the restaurant. (*Id.* at 91.)

After Chen's wife was fired, Yap asked for a meeting with Chen and Li Xue Shum. (N.T. at 68, 78.) Chen, Yap and Li Xue Shum met at a McDonald's in late January 2007, at which time, Shum and Yap offered Chen $50,000.00 for his 33 percent interest in the restaurant. (*Id.* at 68.) Chen refused the offer of $50,000.00 since he had invested $95,000.00 in the corporation as of January 2007. (*Id.* at 68-69.) Also, pursuant to the stock purchase agreement, Chen was supposed to receive $88,000.00 for his shares and he discussed that with Yap and Li Xum Shum at that time. (*Id.* at 69.) Unable to resolve the matter, Chen resigned as chef at Olive & Jasmine on January 31, 2007. (*Id.* at 65.)

Less than two months later, a complaint was filed by Chen and Zheng against Wai Hong Shum, Yap and Olive & Jasmine in an effort to recover their capital investment in the restaurant. The March 23, 2007 complaint included, inter alia, a claim for breach of the stock purchase agreement, and breach of the oral employment agreement with Ling Zheng. Yap counterclaimed for breach of an alleged oral agreement by Chen to repay Yap for Chen's pro rata share of the start-up costs advanced by Yap on Chen's behalf, in the alleged amount of $41,282.00. (See defendants' answer, new matter and counterclaim at ¶¶

---

13. This is an interesting reason for Ling Zheng's termination given the fact that both Li Xum Shum and Wai Hong Shum, who host in the restaurant, needed interpreters during the trial of this matter.

47-54.)

A two-day, non-jury trial took place on November 21, 2010, and November 23, 2010. Based upon the facts established at trial and set forth above, I concluded as follows: (1) there was a valid written agreement of sale dated October 5, 2006, which obligated Wai Hong Shum to pay $88,000.00 to Chen for the purchase of Chen's 33 percent interest in Olive & Jasmine; (2) Wai Hong Shum failed to pay the $88,000.00 to Chen thereby violating the agreement of sale of stock; and (3) an oral employment agreement existed between Zheng and Olive & Jasmine, which required the corporation to pay $600.00 to Zheng for each of her three months of employment from October 20, 2006 through January 31, 2007.

Accordingly, on October 12, 2010, I issued a verdict in favor of Chen and against Wai Hong Shum for breach of the stock purchase agreement in the amount of $88,000.00, and in favor of Zheng and against Olive & Jasmine for breach of an oral wage agreement in the amount of $1,800.00, plus interest and costs.[14] Defendants filed a timely motion for post-trial relief, which was denied by order dated November 23, 2010.

Pursuant to plaintiffs' motion to mold bench verdict to include interest and costs, a molded verdict was entered on November 24, 2010, in the amount of $111,855.38 in favor of Chen against Wai Hong Shum, and $4,934.88 in favor of Zheng against defendant Olive & Jasmine. Final judgment was entered on December 13, 2010, and

---

14. It was further ordered that judgment was entered in favor of Chen and against Yap on Yap's counterclaim for breach of the alleged shareholders' oral agreement to pay additional start-up costs in the amount of $41,282.00.

defendants filed their notice of appeal to the Superior Court of Pennsylvania on December 14, 2010.

Pursuant to this court's directive, defendants filed a concise statement of errors complained of on appeal which raises six issues: (1) whether the court erred in failing to grant Wai Hong Shum's motion for compulsory nonsuit on the claim for breach of the stock sale agreement; (2) whether the court's findings of fact are inconsistent with the conclusion of law that the stock sale agreement was a valid agreement; (3) whether the court's finding that the testimony of Chen was credible is against the weight of the evidence and unsupported by substantial evidence of record; (4) whether the court's finding that Chen was never paid the sum of $88,000.00 by Wai Hong Shum was against the weight of the evidence; (5) whether the court's finding that there was no accurate written record of Chen's contributions to Olive & Jasmine is against the weight of the evidence; and (6) whether the court's finding that there were no receipts kept by the corporation for the remodeling expenses is against the weight of the evidence.

## II. STATNDARD OF REVIEW

Initially, I note that an appellate court's scope of review is quite limited when examining the decision of a trial court sitting as fact finder. The findings of fact of a trial judge sitting without a jury have the same weight and effect on appeal as a jury verdict and the appellate court must defer to the factual findings. *Alberici v. Safeguard Mutual Insurance Co.,* 664 A.2d 110, 113 (Pa. Super. 1995); *Bethlehem Steel Corp. v. Litton Industries, Inc.,* 468 A.2d 748, 752 (Pa. Super. 1983). A reviewing court will not disturb the trial judge's findings of fact unless

they are predicated upon an error of law or are unsupported by competent evidence. *Green v. Schuylkill County Board of Assessment Appeals,* 565 Pa. 185, 195, 772 A.2d 419,426-27(2001); *Thatcher's Drug Store v. Consolidated Supermarkets,* 535 Pa. 469, 477, 636 A.2d 156, 160 (1994). It is also clear that in reviewing the findings of the trial judge, the prevailing party is entitled to have the evidence viewed in the light most favorable to him and all the evidence and proper inferences favorable to the successful party must be taken as true and all unfavorable inferences rejected. *Adamski v. Miller,* 545 Pa. 316, 319, 681 A.2d 171, 173 (1996); *Bethlehem Steel,* 468 A.2d at 752.

In a bench trial it is the duty of the trial judge to judge the credibility of the witnesses and to weigh their testimony. *Weir v. Estate of Ciao,* 521 Pa. 491, 503, 556 A.2d 819, 824 (1989). Absent an abuse of discretion, the appellate court must defer to the trial court on issues of credibility and weight of the evidence, as that court has had the opportunity to observe the demeanor of the witnesses. *Thatcher's Drug Store,* 535 Pa. at 477, 636 A.2d at 160; *Walkenstein v. Walkenstein,* 663 A.2d 178, 183 (Pa. Super. 1995). Similarly, an appellate court may not reweigh the evidence and substitute its judgment for that of the trial judge. *Adamski,* 545 Pa. at 319, 681 A.2d at 173; *Bethlehem Steel,* 468 A.2d at 752.

In the instant matter, I found the testimony of Hua Ming Chen and Ling Zheng to be credible, and discounted as completely unreliable and less than candid the testimony of Wai Hong Shum, Li Xum Shum and Swee Hong Yap.

## III. DISCUSSION

### A. *Motion for Nonsuit*

Initially, Wai Hong Shum claims it was error for the court to deny his motion for nonsuit on the claim for the breach of the stock sale agreement. (N.T. at 97.) After plaintiffs rested their case, defendant Shum moved for a nonsuit on the breach of contract claim arguing that plaintiffs had not proven the elements of their cause of action. (*Id.* at 95-96.)

Three elements are necessary to properly plead and prove a cause of action for breach of contract: (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damages. *Omicron Systems Inc. v. Weiner*, 860 A.2d 554, 564 (Pa. Super. 2004). The existence of a contract was never an issue in this case. Wai Hong Shum filed an answer to plaintiffs' complaint acknowledging that there was an agreement for the sale of Chen's stock. (See answer to complaint at ¶¶ 10, 11, 24; see also N.T. at 74-75.) Moreover, at the start of trial, defense counsel conceded that there was a contract for the sale of Chen's shares in the restaurant. (N.T. at 10.)

During plaintiffs' case, Chen testified that it was his understanding that he was selling his 66 shares to Wai Hong Shum for $88,000.00. (N.T. at 52.) Because Chen did not have the proper legal status to acquire a liquor license, he sold his shares, at Yap's suggestion, to Wai Hong Shum so his name would be removed as an owner of the restaurant. (*Id.* at 59.) However, it was Chen's understanding that he would retain a working interest in the restaurant. (*Id.* at 59, 65, 78.) Specifically, Chen testified: "[O]n the face value, I transfer - I sold him my shares. But actually, I was still one of the shareholders."[15] (*Id.* at 59.)

---

15. There was confusing testimony regarding the nature of this

From this testimony, defendants argue that Chen viewed the stock purchase agreement as a "sham transaction and not an actual agreement," and "therefore there can be no breach of contract in these circumstances, as there was never a meeting of the minds."[16] (Concise Statement at Part I, ¶1(a) & (d).) See *Yarnall v. Almy*, 703 A.2d 535, 539 (Pa. Super. 1997) ("In order to form a contract, there must be an offer, acceptance, and consideration or mutual meeting of the minds."). The evidence establishes that there was, in fact, a meeting of the minds between Chen and Wai Hong Shum for the transfer of the legal ownership interest in the restaurant.

> Under contract law, the objective manifestation of the parties is the governing factor regardless of subjective beliefs and reservations. An "actual" meeting of the minds is not necessary to form a contract. *Long v. Brown*, 399 Pa. Super. 312, 582 A.2d 359, 363 (1990). *Id.* citing *Ingrassia Construction Co. v. Walsh*, 337 Pa. Super. 58, 486 A.2d 478, 482-483(1984).

> In *Ingrassia*, this court stated "In ascertaining the intent of the parties to a contract, it is their outward and objective manifestations of assent, as opposed to their undisclosed and subjective intentions, that matter.... In the instant case, it matters not whether Walsh truly

transaction because of the use of the interpreter. Initially, the interpreter translated Chen's statement as "I sold my shares to Mr. Shum just nominally." (N.T. at 57.) The interpreter then stated that the word "nominally" was his word and not Chen's. (*Id.* at 58.) The interpreter explained that Chen meant the "action was just in form" or "[j]ust for the show," but then clarified that these were also his words and not Chen's. (*Id.*)

16. In response to questioning by defense counsel, Chen specifically denied that the stock transfer was "pretend or fake," insisting that Yap said it was necessary for purposes of acquiring the liquor license (N.T. at 75.)

believed a contract did not exist if his manifested intent reasonably suggested the contrary to Ingrassia." *Ingrassia*, supra at 482-483. It follows then that in the case at bar, it does not matter if Greene did not believe there was a contract if his actions suggested the contrary to Berg and Rambo. *Rambo v. Greene*, 906 A.2d 1232, 1236 (Pa. Super. 2006).

Similarly, in the instant case, it does not matter if Chen did not believe there was an actual transfer of stock if his actions suggested the contrary to Wai Hong Shum and Yap. Chen's actions apparently did because Shum acknowledged the existence of a contract in his answer to the complaint and testified to its existence at his deposition and at trial.

Even assuming, arguendo, that Chen believed the stock sale was simply a legal formality undertaken solely to facilitate the purchase of a liquor license, the agreement is nonetheless enforceable against Wai Hong Shum. As our Supreme Court noted almost two centuries ago: "The principle that a sham agreement, or fraudulent representation, though absolutely void as to third persons, is nevertheless binding on the parties, is as old as the law itself." *Cook v. Grant*, 1827 WL 2695 at *12 (Pa. 1827). Accordingly, this contract, even if a sham and a pretense, is fully "enforceable to the full limit against its crafty deviser."[17] *Fidelity-Philadelphia Trust Co. v. Simpson,*

---

17. I must also note that, while asking the court to rule that no sale of stock took place because of Chen's alleged testimony regarding a "sham agreement," Wai Hong Shum nonetheless denied that Chen is still a shareholder. (N.T. at 96-97.) I cautioned defendant Shum that either Chen sold his stock and is no longer a shareholder in the restaurant, or there was no valid stock purchase agreement and Chen remains a one-third owner in the restaurant, but defendant Shum could not have it both ways. (*Id.* at 97.)

10 Pa. D.&C. 403, 420 (Phila. Co. 1928), modified and affirmed by 293 Pa. 577, 143 A. 202(1928).

There was no error by the court in denying defendants' motion for nonsuit on the claim for the breach of the stock sale agreement.

## B. *Findings of Fact*

In the remaining five errors complained of on appeal, defendants contend the findings of fact are contrary to the weight of the evidence.

Defendants' first claim is that the "conclusion that the Stock Purchase Agreement was a valid agreement is inconsistent with plaintiff Chen's testimony and the findings of fact made by the court. . . which treat plaintiff Chen as a continuing shareholder, and this inconsistency constitutes clear error and is against the weight of the evidence presented." (Concise Statement at Part II, ¶ 1.) This court did conclude that there was an agreement by Wai Hong Shum to purchase Chen's stock in the restaurant for $88,000.00. Until defendant Shum paid Chen the consideration for the stock, Chen remained a one-third owner in the restaurant. There is no inconsistency in these findings. Ultimately, the failure of Shum to pay the money to Chen when he was forced out of the restaurant resulted in this breach of contract action.

Second, defendants charge that the court's finding that the testimony of Chen was credible is against the weight of the evidence and unsupported by substantial evidence of record. Specifically, defendants argue that Chen signed the verification of the complaint in this matter asserting that there was an agreement of sale of stock entered into between Chen and Wai Hong Shum and that under the

terms of that agreement Shum was to pay $88,000.00 to Chen for the stock. (Complaint at ¶¶ 10 & 11.) However, at trial, Chen allegedly testified that the stock sale agreement was a "sham transaction with no intent by the parties to actually transfer the stock." (Concise statement at Part III, ¶ 3.) In fact, during defense counsel's cross examination of Chen, he categorically denied that the stock transfer was "pretend or fake." (N.T. at 75.)

In a bench trial, such as this, the credibility of witnesses and the weight to be accorded their testimony is for the trial judge as the finder of fact. *Weir*, 521 Pa. at 503, 556 A.2d at 824. The court in a non-jury trial is free to believe some, all or none of the proffered testimony. *PSI Upsilon v. University of Pennsylvania*, 591 A.2d 755, 761 (Pa. Super. 1991). In this case, which was complicated by the use of an interpreter, I found the testimony of Chen more credible and persuasive than defendants and their witness, Li Xum Shum, and resolved conflicts in the evidence in plaintiffs' favor.

Chen is a high school graduate who emigrated to the United States with his new bride in 1993. (N.T. at 13-14.) Since his arrival, Chen has worked as a cook at various Chinese and Japanese restaurants. (*Id.* at 14.) He reads no English and speaks very little English. (*Id.* at 49.) Yap, on the other hand, is a U.S. — educated, experienced businessman. (*Id.* at 288.) He holds a master's degree in computer science and managed his uncle's multi-billion-dollar company in Thailand shortly before returning to the United States and opening Olive & Jasmine. (*Id.* at 231, 288.)

After sitting through two days of testimony and observing defendants, it was patently obvious to me, as the

finder of fact, that Yap and Wai Hong Shum had engaged in manipulative and self-serving behavior towards Chen and his wife, Ling Zheng. For example, Yap testified that when he asked Chen for the remainder of the start-up money allegedly owed him by Chen, Chen said that his father had suffered a stroke in China and needed the money. (N.T. at 258-59.) Since he could not give him the cash, Chen allegedly offered himself and his wife to Yap and Wai Hong Shum as indentured servants until the debt could be repaid — essentially working for free for 16 to 18 months while living in the Olive & Jasmine apartment. (*Id.* at 259-60, 301-02.) Such an arrangement would be archaic, although I do not doubt the audacity of Yap to have proposed it to Chen and his wife.

I further found defendants' testimony regarding the capital contributions by the shareholders to be inconsistent and contrived, rather than genuine and forthright. In his verified answer of May 30, 2008, to plaintiffs' first set of interrogatories, Yap stated that Chen contributed a total of $53,000.00 to the restaurant. (See Joint Exhibit 12, Interrogatory No. 12.) When specifically asked to identify what form of payment was used by Chen to pay the $53,000.00, Yap responded that the contribution was in the form of cash and check: "a. Allfirst Bank check number 125 in the amount of $11,645.84[;] b. Cash - $41,354.16." (N.T. at 283-85; see also Joint Exhibit 12, Interrogatory No. 15.)

Yap then testified at his deposition in this matter on February 5, 2009, that Chen contributed a total of $42,000.00 in cash and checks. (N.T. at 283.) At trial, Yap persisted in his story that Chen contributed a total of just $42,000.00: $7,000.00 in cash and $35,000.00 in checks. (*Id.* at 246, 248.) He explained that he "tried to recall from

memory" and from the records he maintained exactly what Chen contributed. (*Id.* at 246.) Joint Exhibit Nos. 4 and 8 confirm contributions by check totaling $35,000.00 for Chen. This undisputed check total[18] plus the testimony of Yap of a $41,354.16 cash contribution results in a total contribution of $76,454.16.

Li Xum Shum's testimony was equally suspect. She testified at trial that she invested a total of $57,000.00 in the restaurant, and all in cash. (N.T. at 166, 169.) However, she then testified that she gave a $28,000.00 check to Yap, which included the $10,000.00 cash she received from Ka Kan Shum and $18,000.00 from her savings. (*Id.* at 186-87.) At her deposition, Li Xum Shum stated first that she gave Yap $10,000.00 in cash on November 20 or 23, 2005. (*Id.* at 210-11). Later, she stated she invested the $10,000.00 cash in December 2005. (*Id.* at 212).

As between the witnesses, I found the testimony of Chen to be most credible and to be supported by substantial evidence of record.

Next, the court's finding that Chen was never paid the sum of $88,000.00 by Wai Hong Shum is argued by defendants to be against the weight of the evidence because Shum offered into evidence as a receipt for such payment the original check for $88,000.00 payable to Chen. There is absolutely no authority for the proposition that an uncashed check is evidence of receipt of the money. A canceled check is proof of payment but not an uncashed check. If the check in this case had been endorsed by Chen and beneath his signature he had written "paid by cash,"

---

18. Chen claims to have also negotiated over to Yap a third-party check from a stock trading account in the amount of $8,000.00. (N.T. at 41-42.)

there would be proof of payment. But there is no case law whatsoever to support defendant Shum's position that a returned check is proof of payment.

The only evidence to support Wai Hong Shum's assertion that $88,000.00 in cash was tendered to Chen in exchange for his stock is the incredible testimony of Shum and Yap. Shum testified that he delivered to Chen at the restaurant on October 12, 2006, $88,000.00 in cash wrapped in newspaper and a brown paper bag. (N.T. at 108, 131-32, 257-58.) He claims to have gone to his father's home after the signing of the stock sale agreement on October 5, 2006, and counted out the $88,000.00 from a "big cookie jar" in the basement. (*Id.* at 107-08, 137, 125.) In exchange for the cash, Chen allegedly returned the $88,000.00 check to Wai Hong Shum. (*Id.* at 109, 258; Joint Exhibit No. 9-A.) Yap also testified that he observed Wai Hong Shum deliver $88,000.00 in cash wrapped in newspaper to Chen in the kitchen at Olive & Jasmine one week after the stock sale agreement was signed. (*Id.* at 257-58.)

I found this testimony regarding Wai Hong Shum counting out $88,000.00 in cash from a cookie jar in his father's home to be absurd and little less than an affront to the intelligence of this court. I rejected it as not credible and unpersuasive. In a bench trial, the court is free to believe all, part or none of the evidence presented, to make all credibility determinations, and to resolve any conflicts in the evidence. *Hodges v. Rodriguez*, 645 A.2d 1340, 1343 (Pa. Super. 1994). As the trier of fact, I weighed the evidence and made findings of fact supported by credible evidence in the record in this case. These findings formed the basis for the conclusions of law which are consistent with the weight of the evidence and the appropriate law of

the case. Wai Hong Shum's complaint that the court did not see the litigation from his perspective is no basis for reversing the verdict.

Fourth, defendants charge the court's finding that there was no accurate written record of Chen's contributions to Olive & Jasmine to be against the weight of the evidence. Yap testified that he maintained spreadsheets of the remodeling expenses and start-up costs. (N.T. at 239; see also 187-88.) Defense counsel stipulated to the fact that a spreadsheet setting forth the contributions made by the parties does not exist. (*Id.* at 281-82.) Defense counsel further stipulated that defendants cannot produce any receipts for or documentation of the contributions made by the parties "other than what's in the notebook." (*Id.* at 297)

This evidence — a spiral-bound, 70-page, school notebook — was produced by defendants, for the first time, at trial, over three and one-half years after the complaint was filed in this action. (N.T. at 273.) Li Xum Shum testified that "important information about the restaurant, including some recipe[s]," was recorded in this notebook and that it was kept with other important documents in the restaurant. (*Id.* at 188-89.) Li Xum Shum testified that both she and Yap knew where the notebook was and had easy access to it. (*Id.* at 189.) While Li Xum Shum acknowledged that this was the only record of the contributions by the shareholders, she also stated that there was no discussion between herself and Yap about bringing the notebook to court to prove what funds were invested and to defend themselves against the claims by Chen. (*Id.* at 189-90.) Upon request of plaintiffs' counsel, Li Xum Shum agreed to go to the restaurant over the lunch recess on the second day of trial to get the evidence and bring it

to court. (*Id.* at 190.)

When Li Xum Shum returned for the afternoon session of court with the notebook, copies were made for the court and plaintiffs' counsel and the evidence was introduced as Joint Exhibit No. 10. (N.T. at 205-06.) At that time, Li Xum Shum testified that she had only recently seen the book for the first time since the restaurant had opened in October of 2006. (*Id.* at 208-09.) Yap also testified that this evidence was found just one week prior to trial but, he also admitted, that its existence was not revealed to plaintiffs or their counsel. (*Id.* at 276-77.)

During Yap's deposition on February 5, 2009, he was specifically asked if there existed any record of the contributions made by the shareholders. (N.T. at 278.) Yap referred only to the bank statements and the spreadsheets. (*Id.*) There was no mention of the spiral-bound notebook. (*Id.* at 279.) Yap, in fact, claimed at trial to have forgotten about this only "evidence of what [Yap] and Li Xum Shum and Kan Kee Shum and...Mr. Chen contributed to this restaurant." (*Id.*) Yap further testified that upon finding the notebook a week prior to trial, he contacted his attorney about it but was advised that it was "too late," and that "it's not going to help your case because at that time you didn't submit it." (*Id.* at 277.) Now defendants rely upon the notebook to dispute plaintiffs' claims.

Based upon a thorough review of the evidence, I found the testimony regarding the contributions made by the parties to be inconsistent with the information set forth in the notebook. Li Xum Shum testified at trial that she made an initial investment of $28,000.00 by check in November 2005. (N.T. at 187.) At her deposition on February 5, 2009, she testified that she made an initial cash payment

of $10,000.00 on or about November 20 or 23, 2005. (*Id.* at 210-11.) The notebook identifies a contribution by Li Xum Shum of $18,500.00 on November 14, 2005, which is inconsistent with both her trial and deposition testimony. (See Joint Exhibit No. 10.)

At her deposition in February 2009, Li Xum Shum testified that she made her next contribution — $10,000.00 in cash — in December 2005, although there is no record in the notebook of any contributions by Li Xum Shum between November 14, 2005 and March 6, 2006. (Joint Exhibit No. 10; see also N.T. at 212.) Finally, Li Xum Shum testified at her deposition that her last contribution was $25,000.00 in cash in May 2006. (*Id.* at 214.) While she explained at trial that the dates were approximate, she did not disavow her previous testimony regarding the amount. (*Id.*) The notebook, however, lists a payment of just $10,000.00 on May 24, 2006. (See Joint Exhibit No. 10.)

Moreover, Li Xum Shum testified that not all of Yap's contributions were recorded in the notebook. (N.T. at 224.) Yap sometimes paid for things with his credit card and other times paid for things with cash. (*Id.*) Most significantly, Li Xum Shum testified that the notebook documented only those amounts that were deposited into the restaurant bank account.[19] (*Id.* at 224-26.)

This testimony calls into question the credibility of the

_____

19. The bank statements introduced by defendants show deposits totaling $128,565.47. (See defendants' Exhibit No. 2.) Yet the notebook shows total contributions from Chen, Li Xum Shum and Kan Ke Shum of $113,000.00, and contributions by Yap of $62,065.47, for a total of $175,065.47. (Joint Exhibit No. 10.) Clearly, all the contributions documented in the notebook were not deposited, just as all the contributions to the restaurant were not written in the notebook.

evidence. Thus, the court's finding that the spiral-bound notebook, containing written notations of contributions made by the shareholders in 2005 and 2006, did not accurately reflect the total amount of money paid into the corporation by each shareholder is supported by the witness testimony and the exhibits. Clearly, the best evidence of the total contributions made by Chen to the corporation is the October 4, 2006, notarized document, signed by Chen, Yap and Li Xum Shum, which confirmed Chen's $88,000.00 contribution. (N.T. at 45-47, 59; Joint Exhibit No. 7.)

Lastly, defendants claim the court's finding that there were no receipts kept by the corporation for the restaurant expenses is against the weight of the evidence. Specifically, defendants argue that "since the corporate checking account records include copies of checks for most of the expenditures made by Olive & Jasmine for renovation and remodeling of the restaurant," sufficient documentary evidence has been produced.

There was absolutely no testimony that Yap, or any other shareholder, retained the receipts for the remodeling and start-up expenses of the restaurant. Rather, the testimony was that Yap prepared spreadsheets that purported to document all of the expenses associated with the restaurant. No documentation was introduced to substantiate the entries on those spreadsheets.

Defendants correctly note that there are, in fact, copies of 96 checks attached to defendants' Exhibit No. 2.[20]

_____

20. Of the 96 checks, at least 52 had nothing to do with the remodeling of the restaurant:

14 were rent checks for the restaurant property; 9 were rent checks for the Olive & Jasmine apartment in which Yap and Chen lived; 23 were utility payments (UGI, PP&L, and East Lampeter Sewer Fund);

However, Yap's spreadsheets identify 264 expenditures from August 2005 through October 2006, so the canceled checks represent just over one-third of the total payments. (See Joint Exhibit No. 13.) Moreover, there are some categories on the spreadsheets that, without receipts, are unverifiable: for example, "restaurant miscellineous [sic] expenses" totaling $2,577.45 and "entertainment expenses" totaling $1,730.52.

Accordingly, this finding of fact regarding the lack of receipts for the restaurant expenses accurately reflects the evidence introduced at trial.

In sum, I found both the evidence and the testimony of plaintiffs Chen and Zheng to be far more credible and worthy of belief than that of the defendants. Indeed, as this case progressed, defendants' "cookie jar" testimony became so bombastic that it became comical.

## IV. CONCLUSION

For the reasons set forth above, the appeal of Shum, Yap and Olive & Jasmine should be dismissed.

Accordingly, I enter the following:

## ORDER

And now, January 25, 2011, the court hereby submits this opinion pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure.

---

and 6 were for insurance. Another nine checks totaling $14,600.00 were written to Yap, two checks totaling $3,500.00 were written to Li Xum Shum, and one check was written for $1,000.00 cash. (See defendants' Exhibit No. 2.) Therefore, fully two-thirds of the checks produced by defendants do not substantiate the renovation and remodeling expenses of the restaurant, as claimed by defendants.